[Nos. B029110, B029118. Second Dist., Div. Five. Aug. 10, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DERRICK LAMONT BROWN et al., Defendants and Appellants.

## COUNSEL

Richard Power and Stephen B. Krimel, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Marc E. Turchin and Joan Comparet, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROWEN, J.*—** In this consolidated case, defendants Derrick Lamont Brown (Brown) and Terry Allen Whitaker (Whitaker) each appeal their respective convictions and sentences to state prison for felonies committed in Los Angeles on January 30, 1987. Brown was convicted of robbery (Pen. Code, § 211),[1] two counts of assault with a firearm (§ 245, subd. (a)(2)), and attempted robbery (§§ 211 and 664). Brown, previously on probation for a

---

* Assigned by the Chairperson of the Judicial Council.

[1] All future statutory references are to the Penal Code unless otherwise indicated.

prior offense, was sentenced to five years in state prison and his probation revoked. Whitaker was convicted of attempted manslaughter (§§ 187, subd. (a) and 664), two counts of assault with a firearm (§ 245, subd. (a)(2)), robbery and attempted robbery (§§ 211 and 664). Whitaker was sentenced to a total of seven years and six months, and an additional two years pursuant to section 12022.5 (use of a firearm in the commission of the felony), which was stayed pending completion of the seven-year sentence. We affirm the convictions and modify the sentences to conform to law.

## DEFENDANTS' CONTENTIONS

Defendants attack the convictions on several grounds. Brown contends that the evidence was insufficient to sustain his conviction for the robbery charged in count V and the assault with a firearm charged in count IV; that the use of a statement made by codefendant Whitaker to impeach him violated *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], which requires the trial court to either sanitize statements made by one defendant in a consolidated trial which implicate a codefendant or to sever the trials); and that his probation revocation must be set aside. Additionally, Brown contends that since the conviction for assault with a firearm (count II) was based on the same course of conduct as the robbery conviction (count V) he cannot be punished for both offenses. Both Brown and Whitaker allege prosecutorial misconduct in closing statements to the jury, denying them a fair trial. They also allege error in the jury's inconsistency in convicting each of them of two counts of assault with a firearm while making separate findings that no principal was armed with a firearm in the commission of the offenses, thus not subjecting either of them to the two-year enhancement pursuant to section 12022.

## FACTS

### 1. *The Prosecution*

The prosecution called Samuel Alvarez (Alvarez), Jose Urias (Urias), Amlicar Romero (Romero) and Detective David Kaufman (Kaufman) as its witnesses. Alvarez, Urias and Romero are El Salvadoreans and claimed to speak no English. Their testimony, taken through a Spanish interpreter, described the following scenario: During the afternoon and early evening of January 30, 1987, Urias, Alvarez and Romero, all carpenters, arrived home from work. The three lived in a two-bedroom apartment at 4180-½ South Hoover in Los Angeles.[2] After a female visitor left, Alvarez locked the door

---

[2] The other inhabitants of the apartment, Porfiro Medrano Wembes and Alva Rosalva (referred to at trial as "the Medranos" or "the Medrano family"), were not involved in the actions herein as victims or witnesses.

to the apartment. The three men shared the same bedroom in the apartment and, at approximately 7 p.m., all three went to sleep. Alvarez slept in the closet, his customary place. At approximately 10 p.m., Urias and Alvarez were awakened by loud banging noises at the front door of the apartment. Urias got up and put on his pants just as the door to their bedroom was kicked in. Urias turned on the bedroom lights. He grabbed a knife he had left on a table earlier that evening after cutting some fruit. The knife had a seven-and-one half inch blade. He saw Whitaker and Brown at the door to his bedroom. Whitaker was aiming a gun at him.

Alvarez testified that after he was awakened by the noise, he got up and put on his pants and shoes. He stated that his wallet, which contained approximately $280, was in his pants pocket. He recounted that Whitaker fired two shots at him, one hitting him (Alvarez) and the other hitting the closet door in the bedroom. Thereafter, Whitaker struck Alvarez with his hand, almost knocking him down.

Urias testified that he saw Alvarez clutch his chest and fall; that Whitaker then pointed the gun at him (Urias) holding it about six inches from his head. With his other hand, Whitaker motioned for Urias to put the knife he was holding on the bed. Whitaker said something to Urias in English which Urias did not understand. Urias dropped the knife onto the bed and Whitaker then struck him, knocking Urias down. After that, Whitaker fired at Urias's head from about 18 inches away. Urias dodged, moving his head to avoid being hit. Whitaker fired a second shot at Urias's head which hit the wall.

At trial, Alvarez identified Brown as one of the two men who had entered his bedroom. He stated that he had observed Brown searching the apartment and saw Brown take his (Alvarez's) wristwatch from the bedroom window sill. Brown also searched Romero and attempted to search Urias. Alvarez testified that while Whitaker pointed his gun at Romero, Brown demanded that Romero give up his money.

At that point, all three victims of defendants' alleged onslaught took the offensive. Alvarez grabbed a small pocket knife (with a two-inch blade) from a key ring and, with knife in hand, he and Romero jumped Whitaker. Whitaker fell backwards, hitting the wall. The gun fell out of Whitaker's hand, firing a shot as it fell. Brown tried to retrieve the gun but Urias got to it first. Urias picked the gun up. Romero picked up a bag that had a hammer in it and the knife that Urias had earlier dropped on the bed, in response to Whitaker's command. Urias, Alvarez and Romero chased Whitaker and Brown out of the apartment. Upon catching up with Whitaker, Urias pointed the gun at Whitaker's head and pulled the trigger. It did

not fire, however, because there were no bullets left in the gun. Romero then hit Whitaker with the hammer that was in the bag he had secured and he and Alvarez stabbed Whitaker with a knife. Whitaker and Brown were finally able to escape from their three alleged victims. After the melee was over, Romero took Alvarez to the hospital. Later, Alvarez discovered that his wallet and cash were missing.

Prior to trial, Romero attended a live line-up in which Brown appeared and identified someone other than Brown as his assailant. At trial, Romero was able to identify Whitaker as one of his attackers, but could still not identify Brown as the other.

The prosecution's final witness, Detective Kaufman, testified that on January 20, 1987, he went to the alleged victims' apartment at 4180-½ South Hoover and saw that the lock to the door of the apartment had been broken. He also observed that the outside of the door at the bottom of the stairway leading to the apartment had bootprints on it. The lettering "PONY" could be discerned from the imprint left on the door by the sole of the shoe. Additionally, Kaufman testified that the door to the rear (alleged victims') bedroom of the apartment was damaged and that there were four bullet holes in the walls and window inside the bedroom. Kaufman arrested Brown at a nearby apartment, located at 4227 South Hoover Street. Kaufman testified that at the time of his arrest, Brown was sitting in the apartment, not wearing a shirt, eating a bowl of cereal. Kaufman noticed that Brown had a tattoo on his chest with the inscription "Li'l Pistol Pete." Later Kaufman interviewed Whitaker in the Los Angeles County Jail. At first Whitaker denied ever being in the alleged victims' apartment. Later, however, during that same interview, Whitaker told Kaufman that a friend, "Pete," had told him that his (Whitaker's) girlfriend was being raped in an apartment and that Pete then took him to the (alleged victims') apartment.

## 2. *The Defense*

Whitaker testified that he usually stands in front of 4227 South Hoover, his own apartment and the place where Brown was arrested, selling marijuana. He said that he had sold marijuana to Urias on other occasions prior to the date in issue and that he had also seen Romero before that day. He claimed that both Romero and Urias speak English. Whitaker stated that on January 30, 1987, between 10:40 and 11 p.m., Urias and Romero had approached him. Urias said that they wanted to buy some marijuana and Whitaker showed them three plastic baggies. Urias "snatched" the bags from Whitaker's hand and ran off with Romero. Whitaker chased them both to the apartment at 4180-½ South Hoover intending to ask them to give back his marijuana. When he arrived at that location, Whitaker

observed Alvarez standing in the open doorway to the apartment. Whitaker told Alvarez that he had seen Urias and Romero run into the apartment and that Urias had stolen his "weed." Alvarez indicated that he did not speak English so Whitaker pointed at Urias, whom he could see in the apartment's living room through a crack in the doorway.

At which time, according to Whitaker, Alvarez, who weighed about 165 pounds, pulled Whitaker into the apartment. In response, Whitaker, who weighed about 200 pounds and was trained in the martial arts, punched Alvarez. Alvarez then stabbed Whitaker in the chest with a knife. Whitaker attempted to kick Alvarez but missed and fell. Urias and Romero then advanced on Whitaker, precluding his attempt to leave. Urias had a gun in his hand. Whitaker denied bringing a gun to the apartment or ever using a gun in the encounter with the prosecuting witnesses. Urias fired two shots, one hitting Whitaker in the kneecap and the other hitting Alvarez in the chest. As Whitaker fell, Romero came at him with a meat cleaver and when Whitaker attempted to block himself from the attack, the meat cleaver cut his arm. Whitaker testified that he was able to crawl out of the door, but could not remember how he got out of the apartment or to the hospital where he was treated for his wounds. Whitaker denied ever going into the alleged victims' bedroom and could not explain the bullet holes found by the police. It was stipulated that at about 12:30 a.m. that night, paramedics took Whitaker to the hospital where he was admitted in critical condition and was treated for major trauma. At trial, he showed a scar on his knee and a wound on the inside of his leg. Whitaker testified that on the night in question, he had been wearing dress leather shoes, of the "Stacy Adams" brand, with regular leather soles.

Brown testified that he knew Whitaker but that they were not friends. He admitted that he (Brown) had been known by the nickname "Pete." Brown denied any knowledge of what had occurred inside the apartment at 4180-½ South Hoover. He claimed that at about 11 p.m. on January 30, 1987, he was at his girlfriend's house, about two blocks away from the alleged victims' apartment. Brown testified that he left his girlfriend's house at approximately 11:20 p.m. to go home. On the way home, he passed a crowd of people and saw Whitaker lying on the steps leading down from a second floor apartment hollering for help. He went up to Whitaker and asked what was wrong. Brown then heard a click and, looking up, saw Urias with a gun standing in the apartment doorway. Brown pulled Whitaker to the bottom of the steps, got him up, and helped him to Whitaker's apartment at 4227 South Hoover, the site of Brown's subsequent arrest, where Whitaker passed out. After calling for medical help for Whitaker, Brown left to return to his own residence. Before leaving, however, the medical attendants who responded to Brown's call gave him Whitaker's

keys and shoes. Brown testified that Whitaker was wearing "Stacy Adams" shoes on the night in issue. Brown testified that on the day of his arrest, he had gone to Whitaker's apartment at 4227 South Hoover to return Whitaker's keys and was in the hallway of the apartment building when he was arrested. He denied being inside Whitaker's apartment eating cereal.

## DISCUSSION

### 1. *Sufficiency of Evidence to Show Robbery*

Robbery is defined as the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear (§ 211).

 Brown contends that the evidence presented was insufficient to support the robbery convictions. He contends that because Alvarez was not forced to give up his watch or his wallet and did not testify that he was afraid, the essential elements of force and fear are absent, precluding conviction. He also claims that the "immediate presence" requirement is not met because Alvarez admitted being in the bedroom closet while his watch was taken from the bedroom window sill. In addition, Brown contends that there was no evidence whatsoever that he or Whitaker took Alvarez's wallet, the victim's testimony being merely that Alvarez discovered his wallet was missing after being taken to the hospital.

The "fear" which induces a victim to part with his property may be either the fear of an unlawful injury to the person or the property of the person robbed, or the fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery (§ 212). The force or fear required by section 211 is not synonymous with a physical corporeal assault. (*People* v. *Hays* (1983) 147 Cal.App.3d 534, 543 [195 Cal.Rptr. 252].) The threat to inflict injury is, alone, sufficient to satisfy the statutory requirement if it causes the victim to part with his property. (*People* v. *Wolcott* (1983) 34 Cal.3d 92, 100 [192 Cal.Rptr. 748, 665 P.2d 520].)

 Accepting the victims' recitals as true, which the jury obviously did, the defendants clearly used force in entering the apartment and maintaining control over the inhabitants by pointing a gun in their direction. The firing of the bullets at Alvarez and Urias in conjunction with the defendants' demands for money clearly made all three men thus confronted aware that they would be harmed if they did not follow the defendants' directions and acquiesce to their demands. After Alvarez was shot at by Whitaker, he saw Whitaker aim his gun at Urias and witnessed the defendants' demand

to Romero that he hand over money. It was only through Whitaker's detention of the victims in the fashion described that Brown was able to search the apartment for valuables. The aiming and firing of a loaded gun at close range allowing the defendants to search the victims and their apartment clearly established the necessary force element for the commission of the crime of robbery. (*People* v. *Wolcott, supra,* 34 Cal.3d at p. 100; *People* v. *Hays, supra,* 147 Cal.App.3d at p. 532.)

■ The "immediate presence" requirement of section 211 is generally liberally construed. (*People* v. *Hays, supra,* 147 Cal.App.3d at p. 541; *People* v. *Miramon* (1983) 140 Cal.App.3d 118, 124 [189 Cal.Rptr. 432].) The requirement is satisfied as long as the victim perceived any overt act connected with the commission of the offense. (*Ibid.*) Any and all of the sensory perceptions are included in determining "presence." The actual corporeal presence of the victim is not required. (*People* v. *Hays, supra,* 147 Cal.App.3d at pp. 541-542.) Even when a victim flees the immediate vicinity of the crime, but perceives (e.g., hears) events he understands are occurring in connection with a robbery, this requirement is satisfied. (*People* v. *Hays, supra,* 147 Cal.App.3d at pp. 541-542.) ■ Here, Alvarez testified, contrary to Brown's argument, that he did see Brown take his watch from the bedroom window sill after he had come out of the closet, thus there was sufficient evidence for the jury to find that the watch was taken from his immediate presence. This finding alone supports the robbery conviction and therefore, it is unnecessary to examine the sufficiency of the evidence to support a conviction for the robbery of the wallet.

2. *Sufficiency of Evidence to Show Assault on Urias*

■ Brown also contends that the evidence fails to show proof of intent to commit an assault on Urias. He claims that at most, the evidence supports a charge of brandishing, but that nothing was presented to establish that Whitaker was trying to hit Urias when he fired his gun.

An assault is an attempt to commit a battery. (*People* v. *Cotton* (1980) 113 Cal.App.3d 294, 301 [169 Cal.Rptr. 814].) Assault with a deadly weapon is termed a "general intent" crime because it is not necessary to find a specific intent to cause a particular injury. What is required, however, is the general intent to willfully commit a battery, an act which has the direct, natural and probable consequences, if successfully completed, of causing injury to another. (*Ibid.; People* v. *Rocha* (1971) 3 Cal.3d 893, 899 [92 Cal.Rptr. 172, 479 P.2d 372].) Intent to frighten or mere reckless conduct is insufficient. (*People* v. *Cotton, supra,* 113 Cal.App.3d at p. 301.)

A gun is a deadly weapon and capable of inflicting bodily harm. (*People* v. *Goins* (1981) 118 Cal.App.3d 923, 926 [173 Cal.Rptr. 655].) Pointing the

loaded gun in Urias's direction and then firing it off can clearly be inferred as reflecting an intent to injure and not merely an intent to frighten. (*People v. Parks* (1971) 4 Cal.3d 955, 961-962 [95 Cal.Rptr. 193, 485 P.2d 257]; *People v. Laya* (1954) 123 Cal.App.2d 7, 16 [266 P.2d 157]; see also *People v. Lathus* (1973) 35 Cal.App.3d 466, 470 [110 Cal.Rptr. 921].)

Urias saw Whitaker aim a gun in his direction. Urias testified that he was afraid when Whitaker held the gun to his head. He also declared that he did not use the knife he held in his hand because he was afraid Whitaker would shoot him. According to Urias, Whitaker fired two shots in his direction, both from about one and a half feet away. Romero, on the other hand, initially testified that he thought Whitaker was only trying to frighten Urias. He stated that Whitaker held the gun at such an angle that he could not have hit Urias. Upon further questioning, however, Romero admitted that he really did not know whether Whitaker was attempting to shoot Urias or not. Romero acknowledged that Whitaker was only five feet away from Urias when he shot at him and stated that Urias kept moving to avoid being hit. Shooting a loaded gun in the direction of a moving target from such close range constitutes substantial evidence from which the jury could infer that Whitaker had the intent necessary to support the charge of assault. (*People v. Parks, supra,* 4 Cal.3d at p. 962.)

### 3. *Effect of Inconsistent Verdicts on Firearm Allegations*

■ Whitaker was found guilty of assault with a firearm on Alvarez and Urias (counts II and IV). Each count was enhanced by an allegation that he personally used a firearm (§ 12022.5),[3] both of which enhancements were found true by the jury. However, an additional allegation to each such count for the arming of a principal in the commission or attempted commission of a felony (§ 12022, subd. (a)),[4] was found to be untrue. Brown was similarly charged on counts II and IV, with the same additional arming allegations (§ 12022). Likewise, none of these arming allegations were found

---

[3] Section 12022.5 provides in pertinent part that: "(a) [A]ny person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for two years, unless use of a firearm is an element of the offense of which he or she was convicted."

[4] Section 12022, subdivision (a) provides that "[A]ny person who is armed with a firearm in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year, unless such arming is an element of the offense of which he or she was convicted. This additional term shall apply to any person who is a principal in the commission or attempted commission of a felony if one or more of the principals is armed with a firearm, whether or not such person is personally armed with a firearm."

to be true for Brown either. Accordingly, defendants claim that because of this inconsistency and the impossible fact situation which it presents (that both actors were convicted of assault with a deadly weapon, yet there was no finding that a principal was armed), that the jury's verdict as to counts II and IV should be reversed, or at the very least that the convictions be reduced to the lesser included crime of assault.

Pursuant to section 954, verdicts which are inconsistent in fact may nevertheless be sustained.[5] (*People* v. *Federico* (1981) 127 Cal.App.3d 20, 32 [179 Cal.Rptr. 315].)

"Present procedure contemplates that the trier of fact first determines whether the defendant is guilty of the charged offense or a lesser included offense, and only then decides the truth of any enhancements. (See CALJIC No. 17.19.) The sentencing judge then decides whether to use the fact found as an enhancement to impose the upper term of the sentence, or to enhance the sentence (Cal. Rules of Court, rule 441)." (*People* v. *Wolcott, supra*, 34 Cal.3d at p. 101.)

An enhancement pursuant to section 12022.5 does not prescribe a new offense but is merely additional punishment for an offense in which a firearm is used. (*People* v. *Wolcott, supra*, 34 Cal.3d 92, 100.) The use of the term "enhancement" as opposed to "offense" does not nullify the underlying rationale of upholding an inconsistent jury verdict if it is otherwise supported by substantial evidence. (*People* v. *Lopez* (1982) 131 Cal.App.3d 565, 571 [182 Cal.Rptr. 563].)

The evidence was plainly sufficient to support the charge of assault with a firearm. In addition to the evidence supporting the charge of assault (see § 2, *supra*) each of the three victims testified clearly as to the use of a gun by Whitaker. That was further corroborated by Detective Kaufman's testimony about the bullet holes found in the victim's apartment walls. The negative finding on the allegations of an armed principal pursuant to section 12022 was a determination more favorable to the defendants than the evidence warranted and was within the province of the jury as an exercise of their mercy. It does not compel reversal of the conviction. (*People* v. *Federico, supra,* at p. 33.)

---

[5] Section 954 provides in pertinent part that: "An accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, under separate counts. . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged. . . . An acquittal of one or more counts shall not be deemed an acquittal of any other count."

### 4. *Aranda Violation by Impeaching Brown with Whitaker's Statement*

██ Brown contends that the trial court erred when it allowed into evidence Detective Kaufman's statements that (1) Whitaker had told him he had gone to the victims' apartment with his "play brother Pete" and (2) that Brown had a tattoo on his chest that said "Li'l Pistol Pete." Brown claims that permitting these statements to come before the jury is in violation of *People* v. *Aranda, supra,* 63 Cal.2d 518, which holds that it is error to admit at a joint trial, a codefendant's extrajudicial self-incriminating statement when such statement inculpates another defendant, even if a limiting instruction is given. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1121 [240 Cal.Rptr. 585, 742 P.2d 1306].) If effective deletions cannot be made from the statement, the court is required to either sever the trials or exclude the statement from the joint trial. (*People* v. *Aranda, supra,* 63 Cal.2d at pp. 529-531.)

Brown argues that even if the statement were admitted only for the purposes of impeaching Whitaker and not to incriminate Brown, it is still highly unlikely to expect the jury to ignore such incriminating statements despite any limiting instructions. Here, Brown reasons, Kaufman's testimony about his conversation with Whitaker clearly implicated him (Brown) in the crime.

The error claimed here, even if correct, does not justify reversal on that ground alone because (1) the properly admitted evidence of Brown's guilt was overwhelming, and (2) the evidence provided by the incriminating extrajudicial statement of Brown's participation was cumulative of other direct evidence presented by eyewitnesses. (*People* v. *Anderson, supra,* 43 Cal.3d at p. 1129.) The testimony of all three victims, Alvarez, Urias and Romero, that there were two men present in their apartment, Alvarez's identification of Brown, and the inconsistencies between Whitaker's testimony and the physical evidence all supported the prosecution's case and the jury's verdict. Any implication of Brown in Kaufman's testimony of statements made to him by Whitaker was merely cumulative of other overwhelming evidence presented. We can thus conclude that any error was harmless beyond a reasonable doubt. (*People* v. *Anderson, supra,* 43 Cal.3d at p. 1128; *People* v. *Leach* (1975) 15 Cal.3d 419, 446-44 [124 Cal.Rptr. 752, 541 P.2d 296]7.)

### 5. *Prosecutorial Misconduct in Closing Argument*

██ Defendants claim that the prosecutor committed misconduct in his closing arguments by stating his personal opinion as to the defendants'

guilt, claiming that defense counsel had fabricated a defense, appealing to the jury to disregard the law, and by arguing facts not in evidence. At trial, however, defense counsel neither objected to any of the prosecutor's remarks nor requested an admonition from the court.

■ A prosecutor has wide latitude in making his argument to the jury, as long as it amounts to fair comment on the evidence, including reasonable inferences or deductions to be drawn therefrom. It is also clear that counsel may state matters not in evidence, but which are common knowledge, or are illustrations drawn from common experience, history or literature. (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 396 [226 Cal.Rptr. 880].)

■ " 'Prosecutorial misconduct implies the use of deceptive or reprehensible methods to persuade either the court or the jury.' [Citations.] 'It is not necessary to show bad faith, but it is necessary to show the defendant's right to a fair trial was prejudiced [by the claimed misconduct.]' " (182 Cal.App.3d at p. 390.)

■ When a defendant complains of prosecutorial misconduct for the first time on appeal, the contention must be rejected if a timely objection and admonition would have cured the harm. (*People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468]; *People v. Sassounian, supra,* 182 Cal.App.3d at pp. 396-397; *People v. Beach* (1983) 147 Cal.App.3d 612, 628 [195 Cal.Rptr. 381].) Only if an objection and admonition would not have cured the harm must the appellate court decide whether on the whole record the harm resulted in a miscarriage of justice. (*People v. Green, supra,* at p. 34; *People v. Miramon, supra,* 140 Cal.App.3d 118, 125.)

Defendants claim to be excused from the timely objection requirement because the case was closely balanced and because of the futility of the effect of any admonitions on the jury after the damage allegedly caused by the prosecutor's statements.

In order to evaluate their contentions, we turn to each of the alleged instances of misconduct.

a. *Opinion on guilt.*

Defendants claim that the prosecutor implied that he had evaluated evidence not heard by the jury, indicated that he thought the defendants were guilty from the beginning, and implied that he would not be prosecuting the case unless he personally believed them to be guilty.[6]

---

[6]The comments objected to were: "I've lived with the case for quite some time and I've looked at it from every angle, as have you—but not as long as I have. I won't try to

■ A prosecutor may indicate his belief that he has introduced sufficient evidence to prove appellant's guilt beyond a reasonable doubt as long as he doesn't imply that he has knowledge of facts indicating appellant's guilt which were not in evidence. (*People* v. *Wiley* (1976) 57 Cal.App.3d 149, 163 [129 Cal.Rptr. 13].) A prosecutor's statement that he believes the defendant to be guilty is improper if it is tantamount to a testimonial assertion that the prosecutor believed the defendant guilty from the inception of the prosecution; any such assertion implies that the district attorney possesses proof of guilt beyond that which the jury has examined. (*People* v. *Calpito* (1970) 9 Cal.App.3d 212, 222-223 [88 Cal.Rptr. 64].)

Here the prosecutor did not allude to any hidden facts nor did he state that he had always believed the defendants were guilty. He simply commented on the strength of the evidence (*People* v. *Rice* (1970) 10 Cal.App.3d 730, 743 [89 Cal.Rptr. 200]) and stated that he had lived with and looked at the case longer than the jury, which is reasonable and to be expected. We find no misconduct in these statements.

b. *Fabrication of defense.*

■ Defendants next contend that the prosecutor claimed that defense counsel had fabricated the defense. The comments objected to were as follows:

"It stretches our imaginations to believe any of this testimony of Mr. Brown and Mr. Whitaker."

"That's all the defense is in this case, Ladies and Gentlemen, is smoke. None of it makes sense."

"I'd like to first thank Mr. Melcher for his brevity in addressing the issues that were before the court and the jury. I'd like to thank Mr. Melcher for providing the smoke that I assured you earlier would be provided by the defense in their argument." And

"I felt frustrated, to some degree, as I sat there thinking about the things that were being laid out in the defense argument to try to what I saw as confuse you Ladies and Gentlemen. . . ."

In his statement to the jury, a prosecutor may go so far as to imply that the defense was fabricated if such inference is supported by the evidence.

superimpose my views of what I see in this case on you, but rather, maybe the things I say you can use as a different reference point, as a different way of looking at things. Take it as I hope you will take the views of each of the other jurors when you are back there. Stand in that person's shoes, stand in my shoes. Look at it the way I look at it, and decide for yourself whether it's reasonable to look at it that way, if I bring up something that you hadn't thought of." And: "I hope to make it very brief, because, as I said, the case is a very, very strong one, if ever there was."

(*People* v. *Milner* (1988) 45 Cal.3d 227, 245 [246 Cal.Rptr. 713, 753 P.2d 669].) In the matter in issue here, however, we find no indication of even that kind of assertion in the prosecutor's argument. The prosecutor merely commented on the credibility and relevance of the evidence presented by the defense and the manner of presentation.

### c. *Urging jury to disregard the law.*

██ Defendants claim the prosecutor made a blatant appeal to the jury to disregard the law by making the following statement: "But when it comes time to deciding what happened, what the facts are, we trust a jury to do it. We trust people who come in from their homes, from their jobs, from the street, who aren't immersed in this strangeness that the law really is in a lot of ways, and say 'Just use your common sense. Don't play games with some esoteric notion. Don't play games with ideas that—that judges and lawyers have spent hundreds of years trying to develop. . . [']"

In urging prosecutorial misconduct, the defendants have taken this statement out of context. Immediately preceding and following the above quoted utterance, the prosecutor explicitly referred to the jury's domain as fact-finders. He advised that: "You are brought into this process as fact-finders. We, as attorney, and the judge, make determinations about the law, and we handle the law aspect of it. . . ." and that "You listen to the people, you listen to the facts, and you decide what happened just as common people." The prosecutor did not exhort the jury to disregard the law, but instead explained their role as finders of fact and requested that they refrain from reinterpreting the law. Under the circumstances, there was no error in such statement to the jury.

### d. *Arguing facts not in evidence.*

██ Finally, defendants contend that the prosecutor implied that two of the victims, Alvarez and Urias, had identified Brown at the lineup when, in fact, Romero had failed to do so, and left the jury with the impression that information regarding the lineup was being withheld from them as was other evidence regarding the other inhabitants of the apartment.[7]

---

[7]Appellants refer specifically to the following statements: "Mr. Melcher pointed at—at Mr. Romero's failure to identify Brown and pointed at the line-up. The line-up. You will get to see the line-up.

"Well, Ladies and Gentlemen, he didn't point at any line-ups from the other ones, did he? He didn't say these others missed any line-ups. Mr. Melcher told you that the day before the preliminary hearing these people were taken to try to identify these people, and yet, was able to point at one person who missed one identification. That was it."
and

"A prosecutor has the right to state his views, his belief and conviction as to what the evidence establishes, and to urge that the evidence convinces his mind or is conclusive of the guilt of the defendant. [Citation.] It is within the domain of legitimate argument for a prosecutor to state his deductions or conclusions drawn from the evidence and to relate to the jury that, in his opinion, the evidence shows that the defendant is guilty of the crimes charged, unless his statements are not based upon legitimate evidence or are to the effect that he has personal knowledge of the defendant's guilt. [Citation.]" *(People* v. *Calpito, supra,* 9 Cal.App.3d at p. 223.) The prosecutor may discuss evidence presented and give his view to the jury as to what proper deductions and inferences the evidence warrants. *(People* v. *Rice, supra,* 10 Cal.App.3d at p. 743.)

Contrary to the prosecutor's statements, the only testimony regarding the other inhabitants of the apartment was from Urias. There was no testimony from either Brown or Whitaker about their reasons for not confronting the Medranos. The prosecutor also promised the jury they would get to see the lineup, which did not happen. Since these matters were clearly not brought out in the testimony at trial, they were improperly referred to in argument. It is clear in this instance, however, that any resulting jury confusion from these misstatements could easily have been cured by a timely objection and admonition. Reasonably considered, there is no ground to excuse appellant from the general requirement of a timely objection, and the point must be deemed waived. *(People* v. *Miramon, supra,* 140 Cal.App.3d at p. 126.) In addition, the error complained of is not sufficient to merit reversal because it appears certain that any reasonable jury would have reached the same verdict even in the absence of these remarks. *(People* v. *Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].)

### 6. *Stay of Count II Pursuant to Penal Code Section 654*

 Defendants contend that pursuant to Penal Code section 654,[8] a stay should be ordered on count II, assault with a firearm on Alvarez, since it arose from the same course of conduct as alleged in count V, robbery.

If a course of conduct causes commission of more than one offense, it must be determined if a separate and distinct act is the basis of each conviction. If there is only a single act, then there may only be one punishment.

---

"Why didn't they go into Medrano's room? The reason they didn't go into the Medrano's room is because of—after the first room, they entered, Mr. Whitaker got beat up real bad and Mr. Brown didn't want any more of it."

[8] Section 654 provides that "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

For example, if there is an assault in the course of conducting a robbery, then there is only one crime. If the assault occurred after the robbery, then there are two crimes. (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 19-20 [9 Cal.Rptr. 607, 357 P.2d 839].)

Under the prosecution's theory, which we have ascribed to, the force used by the defendants in committing the robbery consisted of a course of conduct that included their forcible entry into the apartment and their assaults on Urias and Alvarez. The assault of Alvarez was clearly in the course of the robbery and was not a separate and distinct act. Thus, the defendants cannot be sentenced on both counts II and V. Since the sentence on count II was ordered to run concurrently with the other counts, the total term imposed is not affected. To effect the proper procedure, however, this reviewing court must modify the sentence to stay imposition of the four-year term on count II. (*People* v. *Martinez* (1985) 171 Cal.App.3d 727, 736 [217 Cal.Rptr. 546].)

### DISPOSITION

For the foregoing reasons, we affirm the convictions and modify the judgment as follows: execution of the sentence imposed on count II (assault with a firearm on victim Alvarez) is stayed pending the finality of the judgment and service of the sentence for count V (robbery), said stay to become permanent upon completion of the term imposed for count V.

Lucas, P. J., and Boren, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 15, 1989.