[No. E013008. Fourth Dist., Div. Two. Oct. 12, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEJANDRO M. LEE, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV, V, VII and VIII.

**COUNSEL**

Randall B. Bookout, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, William M. Wood and M. Eugenia Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DABNEY, J.**—A jury convicted defendant Alejandro M. Lee as charged in count 1 of attempted murder of Turk Young, Jr., with premeditation and deliberation (Pen. Code, §§ 664, 187)[1] and in count 2 of assault with a firearm against Sean Green (§ 245, subd. (a)(2)). The jury found true the special allegations as to both counts that Lee had personally used a firearm (§ 12022.5, subd. (a)) and as to count 1 that Lee had inflicted great bodily injury (§ 12022.7). Lee moved to modify the verdict to attempted voluntary manslaughter or attempted murder without premeditation and deliberation. The motion was denied.

The court sentenced Lee to state prison for life for count 1 with a consecutive four-year middle-term enhancement for firearm use and a consecutive three-year middle-term enhancement for inflicting great bodily

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

injury. The court sentenced him to a concurrent three-year middle term for count 2 and a four-year middle-term enhancement for the firearm use as to that count.

On appeal, Lee contends: (1) the trial court committed reversible error in failing to instruct the jury it could consider provocation by the victim in determining whether the attempted murder was committed with premeditation and deliberation; (2) the trial court erred in instructing the jury on the doctrine of transferred intent with respect to count 2; (3) the evidence was insufficient to establish assault with a firearm; (4) the trial court erred in failing to instruct the jury it must unanimously agree on which act or acts constituted the offense of assault with a firearm; (5) the trial court erred in failing to instruct the jury sua sponte with CALJIC No. 2.71; (6) the trial court erred in permitting Lee to be impeached with his juvenile record; and (7) the trial court erred in instructing the jury with two instructions on consciousness of guilt because there was no evidence to support such instructions.

## FACTS

In the evening of September 19, 1992, Norvile Gill, Tyrone Davis, and Stacy Clark picked up Lee at the Riverside Greyhound terminal in a white Geo Metro hatchback. Gill had no weapons and saw none on Davis or Clark. Lee placed a black gym bag in the car. Someone suggested going to Castle Park, an amusement park in Riverside.

The four arrived there about 10 p.m. and Gill went into the arcade section. When he came back out five minutes later, Lee was having an argument with two other young men. The two had approached Lee and asked him what gang he was from. Lee replied, " 'We're not here about that. Just came to have a good time.' " One of the men uttered an obscenity and Lee turned and walked back toward the parking lot with his companions.

Turk Young, Jr., had been at Castle Park with several friends. He left the arcade to take a walk with his friend J.R. J.R. pointed out that some people kept looking at them. Young then confronted Lee, asking whether "it [was] a problem or something." Lee and Young "mad dogged" each other, i.e., engaged in " '[a] practice where they become involved in a stare down, maintaining eye contact between two parties that may or may not know each other, and a nonverbal challenge of some type.' " Young became angry because Lee's "little buddies or whoever was with him, his friends and stuff, you know, they was sitting on the side, you know, giggling and laughing about it and stuff, you know." A bypasser heard someone say, " 'We'll go banging.' "

Young thought there would be a fight, so he returned to the arcade and told his friends inside what had happened. They advised him to forget about it. Young testified he left the arcade 10 or 15 minutes later, not knowing where Lee and his companions had gone. Other witnesses testified Young collected five to fifteen other young men from the arcade and then followed Lee and his companions to the car. Young and his group kept saying, "What's up?" and making some challenging gestures. In some circles, "What's up?" is considered a challenge to fight.

According to Young, however, he and his group were walking toward their car in the parking lot when they saw a white car back out of a parking space 40 or 45 feet away. Young saw the rear hatchback open, and his friend Sean Green said, "They got a gun." Young and his friends turned to run, and several shots were fired rapidly from the car. Young testified that he did not have a weapon that night, and, to his knowledge, none of his friends had a weapon either.

Other witnesses testified that when Lee and his companions reached the car, Lee said, "I've got something for them." Lee went to the hatch area and looked in his gym bag. Young and his group were then 40 or 45 feet away. Lee and his companions got in the car; the hatch was still up. Gill backed the car out, and Lee leaned over the back seat and fired three shots. Young was hit twice in the thigh.[2] The third shot hit a masonry wall. Green was right beside Young when the shots were fired.

Traffic blocked the exit to the park, so Lee and his companions got out of the Geo and ran. The police later discovered Gill and Lee hiding under a motor home nearby and arrested Davis and Clark at Castle Park. When they were in custody awaiting booking, Lee told the others, " 'If they ask you anything, tell them you just heard shots and you ran.' " During police interviews, Gill told the police he had seen a black handgun in Lee's possession. Gill denied this at trial. The gun was never recovered.

*Defense.*

Davis testified six men initially confronted Lee and were "shoving at" him. He heard one of them direct another to "get somebody because he got a 'strap,' " i.e., a gun. Gill gave a defense investigator a similar report.

Lee testified he had been "convicted" as a juvenile of burglary in 1991 and of misdemeanor grand theft in 1990. On September 19, 1992, he had just attended the funeral of his 16-year-old brother who had been killed in a gang

---

[2]The parties stipulated the shots had caused great bodily injury.

shooting a week earlier. Lee took the bus to Riverside "[t]o get away from what was happening in Los Angeles and to . . . get my car." He had a .380-caliber pistol, which he had purchased for protection after his brother's death.

When Gill and the others picked him up, he had intended to get his car, but instead the group ended up at Castle Park. A few minutes after he entered the park, two men approached him. Lee identified Young as one of the men, although he did not know Young at the time. Lee was five feet six inches tall and weighed about one hundred thirty-five pounds. Young was six feet two inches tall and weighed about two hundred pounds.

Young said, " 'Why you mad dogging my homeboy?' " Lee said, "Who are you? Why is he not over here saying I'm looking at him crazy?" The other person said, "Let me go get such and such. He has a 'strap.' " Lee understood him to mean he was going to get someone who had a gun. The man who said that went in the arcade while Young kept yelling and making threatening gestures as if he were about to strike Lee. Lee then decided to leave. He gathered his friends, and they started walking to the car.

When he looked back, he saw the man who had entered the arcade emerge "with a lot of guys." Eight or nine men followed them back to the car. Lee became more and more scared. He said, "I got something for them" as they approached the car, meaning he had a gun for protection if needed.

At the car, Lee looked back and saw a gun in Young's hand. Lee grabbed his gym bag and removed his gun. Young drew his gun, and Lee fired. He never meant to kill anyone. Before firing, he yelled "duck" to warn the other occupants of the car that Young was about to shoot them.

After the shooting, Lee got out of the car and ran. He did not know what happened to the gun. He placed it in his waistband and lost it when running away.

When he was arrested, he told the officer he did not know anything about a shooting. He lied to the officer because he was "scared and nervous." He did not know he had hit anyone. He never told the police Young had pointed a gun at him because he knew nothing about the law of self-defense. He did not recall telling the police they had nothing on him because they had not found the gun. The police never asked him to help find the gun.

*Rebuttal.*

A police investigator testified that Lee did not act scared but rather was truculent during interrogation. He refused to help look for the gun. He said,

" 'You motherfuckers don't have shit. You don't have the fucking gun. You ain't got my fucking prints.' "

DISCUSSION

I

*Failure to Instruct on Provocation by Victim*

■ Lee complains the trial court erred by failing to instruct the jury sua sponte that it could consider provocation by the victim in determining whether Lee acted with premeditation and deliberation.

The jury was instructed based on CALJIC No. 8.42, "To reduce the offense of attempted murder to attempted voluntary manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of such character and degree as normally would excite and arouse such passion, and the assailant must act under the influence of that sudden quarrel or heat of passion."

The jury was further instructed based on CALJIC No. 8.42, "If there was provocation but of a nature not normally sufficient to arouse passion, or [i]f sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return, and if an unlawful attempted killing of a human being followed such provocation, and had all the elements of murder as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to attempted voluntary manslaughter."

Lee complains, however, that these instructions failed to inform the jury that " '[t]he existence of provocation which is not "adequate" to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation.' " (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 329 [185 Cal.Rptr. 436, 650 P.2d 311].)

Thus, Lee asserts, the jury should have been instructed under the language of CALJIC No. 8.73 (1992 rev.) (5th ed. pocket pt.), which states, "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for such bearing as it may have on whether the defendant killed with or without deliberation and premeditation."

Lee contends such an instruction is required sua sponte when supported by sufficient evidence of provocation. Here, the evidence would have supported

a finding that provocation played a part in inducing the attempted murder. Witnesses testified that Young initiated the confrontation. When Lee started to leave, Young and his friends followed him to the parking lot while making challenging taunts and gestures.

To support his argument that a sua sponte instruction was required, Lee cites *People* v. *Johnson* (1993) 6 Cal.4th 1 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People* v. *Perez* (1992) 2 Cal.4th 1117, 1129-1130 [9 Cal.Rptr.2d 577, 831 P.2d 1159]; and *People* v. *Wickersham, supra,* 32 Cal.3d at p. 330. In *Wickersham,* the court found no error in the trial court's failure to instruct sua sponte on voluntary manslaughter based on unreasonable doubt because the defendant did not rely on that theory at trial, and the theory was inconsistent with the defense theory of accidental shooting. However, the court stated that a sua sponte instruction on second degree murder based on provocation must be given "where the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately" to carry it out. The court stated, "The fact that heated words were exchanged or a physical struggle took place between the victim and the accused before the fatality may be sufficient to raise a reasonable doubt in the minds of the jurors regarding whether the accused planned the killing in advance." (*Wickersham, supra,* 32 Cal.3d at p. 329.)

In *Johnson,* the court cited *Wickersham* with approval on the issue of sua sponte instructions on provocation and second degree murder, but determined there was no evidence in the record to support any instructions on provocation. The court further noted such instructions would have been inconsistent with the defendant's alibi defense. (*People* v. *Johnson, supra,* 6 Cal.4th at p. 43.) Similarly, in *Perez,* the court concluded the evidence did not support an instruction on provocation, because "[t]here was no evidence of any provocation, reasonable or unreasonable." (*People* v. *Perez, supra,* 2 Cal.4th at p. 1130.)

The People contend the language in *Perez* and *Johnson* on which Lee relies is merely dicta, and both cases are inconsistent with *People* v. *Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588]. In *Saille,* the defendant contended the court should have instructed the jury sua sponte to "consider his voluntary intoxication in determining whether he had premeditated and deliberated the murder." (*Id.* at p. 1117.) The court held that the defendant must request such instructions. The court explained, "This is so because the defendant's evidence of intoxication can no longer be proffered as a defense to a crime but rather is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a

reasonable doubt. In such a case the defendant is attempting to relate his evidence of intoxication to an element of the crime. Accordingly, he may seek a 'pinpoint' instruction that must be requested by him [citation], but such a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court." (*Id.* at p. 1120.)

Here, the instruction Lee argues for was not an instruction on a defense. Rather, it was an instruction that related certain evidence to an element of the crime and attempted to raise a reasonable doubt as to that element. Such an instruction is a pinpoint instruction under *Saille,* and as such, need not have been given sua sponte. (*People* v. *Saille, supra,* 54 Cal.3d at p. 1120.)

II

*Sufficiency of Evidence of Count 2*

Lee contends his conviction of count 2 must be reversed because no evidence showed he attempted to shoot Green. Rather, he contends, the evidence showed that he intended to shoot only Young.

When a defendant on appeal challenges the sufficiency of the evidence to support his conviction, the court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

"An assault is an attempt to commit a battery. [Citation.] Assault with a deadly weapon is termed a 'general intent' crime because it is not necessary to find a specific intent to cause a particular injury. What is required, however, is the general intent to willfully commit a battery, an act which has the direct, natural and probable consequences, if successfully completed, of causing injury to another. [Citations.] Intent to frighten or mere reckless conduct is insufficient. [Citation.]" (*People* v. *Brown* (1989) 212 Cal.App.3d 1409, 1419 [261 Cal.Rptr. 262], disapproved on another ground in *People* v. *Hayes* (1990) 52 Cal.3d 577, 628, fn. 10 [276 Cal.Rptr. 874, 802 P.2d 376].) "All that is required to sustain a conviction of assault with a deadly weapon is proof that there was an assault, that it was with a deadly weapon, and that the defendant intended to commit a violent injury on another. [Citation.] A battery, or a wounding[,] is not necessary in order to sustain a conviction for assault with a deadly weapon. [Citation.]" (*People* v. *Birch* (1969) 3 Cal.App.3d 167, 177 [83 Cal.Rptr. 98].)

In *Birch*, on which Lee relies, the defendant fired a shot through the window of an apartment at Roderick Ferguson. The bullet apparently passed one to six inches behind a police officer who was standing on the porch of the apartment. (*People* v. *Birch, supra,* 3 Cal.App.3d at pp. 172-173.) The court stated, "Here, there is substantial evidence to show that the defendant intended to commit a violent injury upon the person of Roderick Ferguson. Had the bullet intended for Ferguson struck Officer Council there could be no doubt that the intent to injure Ferguson would be transferred to Officer Council, and in these circumstances the defendant would be guilty of assault with a deadly weapon against both Ferguson and Council. However, the bullet intended for Ferguson did not strike Officer Council and there is no evidence in the record that the bullet fired at Ferguson was intended to inflict a violent injury upon Officer Council. Therefore, the evidence is insufficient to sustain the judgment as to count I of the amended information charging assault upon Officer Council." (*Id.,* at p. 177.)

In context, it appears the defendant in *Birch* was unaware of the presence of Officer Council on the porch. (See *People* v. *Griggs* (1989) 216 Cal.App.3d 734, 742 [265 Cal.Rptr. 53].) Thus, the court concluded the evidence was insufficient to support the defendant's conviction for an assault upon Officer Council. The court further explained, "This is not to say that an assault with a deadly weapon may not be perpetrated against two or more victims by the firing of a single shot where the bullet does not strike any one of the intended victims." (*People* v. *Birch, supra,* 3 Cal.App.3d at p. 177.)

 Here, it was undisputed that Lee was aware of the presence of the group, including Green, who were near Young as they moved toward the parking lot. Thus, this case more closely resembles *People* v. *Spence* (1970) 3 Cal.App.3d 599 [83 Cal.Rptr. 711], disapproved on another ground in *People* v. *Rocha* (1971) 3 Cal.3d 893, 899, footnote 8 [92 Cal.Rptr. 172, 479 P.2d 372]. In *Spence,* the defendant fired two shots into a passing car that had three occupants, for which the defendant was convicted of three counts of assault with a deadly weapon. The court stated, "In the case at bench it was not unreasonable for the jury to infer that in firing two pistol shots into the automobile, defendant was attempting violent injury upon all three passengers, whether by a single bullet injuring more than one person or by shooting the driver, thereby causing the car to go out of control, injuring all occupants." (*Spence, supra,* 3 Cal.App.3d at p. 604.)

The jury could reasonably conclude that Lee intended to harm not only Young, but also some or all of his companions. Witnesses testified that Lee was confronted outside the arcade by both Young and J.R. Lee responded by challenging both of them; specifically, he asked Young why his friend was

not speaking for himself. When Lee and his companions left the park, they were followed by a group consisting of at least five young men including Young, J.R., and Green. Witnesses testified that all of those in Young's group were issuing challenging taunts and gestures. The jury could reasonably conclude from this evidence either that Lee was firing at Young and Green because Green was closest to Young, or that Lee was simply firing at the group, hoping to kill someone.

We conclude the evidence was sufficient to sustain the conviction.

## III

### Instruction on Transferred Intent

In a related argument, Lee contends the court erred in instructing the jury on the doctrine of transferred intent under CALJIC No. 9.10[3] in connection with count 2, assault with a firearm on Green. Lee points out that Green, the victim of count 2, was not an intended target of Lee's gunfire, and he was not struck by gunfire.

Lee contends that no evidence suggested that Lee aimed at Green; the prosecutor conceded that Green was not a target of the shooting. Lee's argument is based on the premise that he fired only at Young because Young had a gun. In convicting Lee of attempted murder with premeditation and deliberation, the jury obviously rejected Lee's testimony to that effect. Lee's view of the evidence, even if accepted by the prosecutor, is not the only reasonable view. As discussed above, the jury could reasonably infer from the evidence that Lee intended violence toward Young and some or all of the group accompanying him.

As noted above, assault with a firearm is a general intent crime, not a specific intent crime. (*People* v. *Colantuono* (1994) 7 Cal.4th 206, 217 [26 Cal.Rptr.2d 908, 865 P.2d 704]; *People* v. *Rocha, supra*, 3 Cal.3d 893, 899].) Thus, a defendant need not intend to commit violence against a specific victim to be guilty of an assault. (*People* v. *Griggs* (1989) 216 Cal.App.3d 734, 742 [265 Cal.Rptr. 53]; *People* v. *Martinez* (1977) 75 Cal.App.3d 859 [142 Cal.Rptr. 515].)

" 'The intent to cause any particular injury [citation], to severely injure another, or to injure in the sense of inflicting bodily harm is not necessary.'

---

[3]The court instructed the jury with CALJIC No. 9.10, "Where one attempts to assault a certain person with a firearm but by mistake or inadvertence assaults a different person, the crime if any so committed is the same as though the person originally intended to be assaulted had been assaulted."

[Citation.] The pivotal question is whether the defendant intended to commit an act likely to result in such physical force, not whether he or she intended a specific harm. [Citation.] Because the nature of the assaultive conduct itself contemplates physical force or 'injury,' a general intent to attempt to commit the violence is sufficient to establish the crime." (*People* v. *Colantuono, supra,* 7 Cal.4th at p. 218, fns. omitted.)

Under *Colantuono* and *Rocha,* a defendant need not intend to strike any particular person to be guilty of an assault, and it is therefore irrelevant whether the defendant strikes his intended victim or another person. It follows that the doctrine of transferred intent does not apply at all in an assault case; there is no specific intent to transfer.

Prior to *Rocha,* however, several courts, including the Supreme Court, applied the doctrine of transferred intent to the crime of assault. (See, e.g., *People* v. *Henderson* (1949) 34 Cal.2d 340, 347 [209 P.2d 785]; *People* v. *Wells* (1904) 145 Cal. 138, 140 [78 P. 470]; *People* v. *Ramirez* (1923) 64 Cal.App.358, 359-360 [221 P. 960].) Even after *Rocha,* appellate courts have applied the doctrine of transferred intent. (*People* v. *Cotton* (1980) 113 Cal.App.3d 294, 301, 307 [169 Cal.Rptr. 814]; *People* v. *Williams* (1980) 102 Cal.App.3d 1018, 1026-1027 [162 Cal.Rptr. 748].) In *Williams,* the defendant fired a rifle at a car with three occupants, Robert Mikel, with whom the defendant had a hostile relationship; James Pullen; and Mikel's two-year-old grandson. Mikel was shot; Pullen and the grandson were unharmed. (*Id.,* at pp. 1022-1023.) The defendant was convicted of assault with a deadly weapon on Pullen and the grandson. (*Id.,* at p. 1026.) On appeal, the defendant contended the court erred in instructing the jury on the doctrine of transferred intent.

The court noted that "the doctrine of transferred intent was developed for the purpose of redressing physical injury." (*People* v. *Williams, supra,* 102 Cal.App.3d at p. 1026.) The court concluded that the jury should be instructed on transferred intent only when "the defendant actually commits an assault against the wrong person, due to mistaken identity [citation] or where the defendant intends to commit an assault against one party, but through faulty aim, actually causes some physical harm to another person [citations]. Since the present case did not involve either of those situations, it was error to give the instruction." (*Id.* at p. 1028.)

In our view, *Cotton* and *Williams* were wrongly decided; they did not consider the implications of *Rocha,* and they are inconsistent with both *Rocha* and *Colantuono.* Thus, the jury should not have been instructed on the doctrine of transferred intent.

In any event, CALJIC No. 9.10 does not tell a jury that a defendant's intent to assault one person may be transferred to some other person. Rather, read in conjunction with CALJIC No. 9.00,[4] CALJIC No. 9.10 clarifies the principle that a defendant is not exculpated from criminal liability for assaulting an unintended victim if he intended to commit a successfully completed act, such as firing a gun, the direct, natural, and probable consequences of which applied physical force upon or injury to another. The instruction removes the jury's focus from considering whom the defendant intended to injure, and directs the jury to consider whether the defendant had the general criminal intent to commit the assaultive act. This was a proper statement of the law under *Rocha.* We find any error in giving CALJIC No. 9.10 was harmless.

IV, V*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

VI

*Impeachment With Juvenile Record*

Before trial, defense counsel sought a ruling on the use of "certain juvenile priors which Mr. Lee has sustained." The court indicated it would allow Lee to be impeached with a misdemeanor grand theft and a felony burglary because both crimes involved moral turpitude and both were recent.

When Lee testified, his counsel asked him whether he had "committed and [was] later convicted of a burglary charge," and had "committed and [was] later convicted of . . . a misdemeanor, grand theft," "both of those as a juvenile."[7] The court instructed the jury that juvenile misconduct could be considered for determining the credibility of a witness.

■ In *People* v. *Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938], the Supreme Court held that the right to Truth-in-Evidence

---

[4]The jury was instructed, based on CALJIC No. 9.00, "intent" element of assault as follows: "The person making the attempt [to apply physical force upon the person of another] had a general criminal intent, which, in this case, means that such person intended to commit an act, the direct natural and probable consequences of which if successfully completed would be the application of physical force upon the person of another."

*See footnote, *ante,* page 1724.

[7]During sentencing, defense counsel stated that the prosecutor had informed him the prior juvenile burglary charge had been dismissed. Thus, Lee claims he was impeached not only with his juvenile record, but also with a phantom prior conviction. Nonetheless, for reasons we discuss, *post,* the mention of the burglary "conviction" was harmless error regardless of whether the burglary had ever been adjudicated.

provision of the California Constitution (Cal. Const., art. I, § 28, subd. (d)) abrogated the rule that defendants could be impeached by felony convictions only (Evid. Code, § 788). The court held that criminal trial courts may, in their discretion, admit conduct showing dishonesty or moral turpitude for impeachment.

In *People* v. *Sanchez* (1985) 170 Cal.App.3d 216, 218 [216 Cal.Rptr. 21], the court held it was clear error to allow juvenile adjudications to be used for impeachment because juvenile adjudications are not criminal proceedings and do not result in criminal convictions. In *People* v. *Jackson* (1986) 177 Cal.App.3d 708, 711-713 [222 Cal.Rptr. 470], the court held that article I, section 28[8] of the California Constitution did not change the rule. The court based its ruling on Welfare and Institutions Code section 1772, subdivision (a) which states, "Every person honorably discharged from control by the Youthful Offender Parole Board who has not, during the period of control by the authority been placed by the authority in a state prison shall thereafter be released from penalties and disabilities resulting from the offense or crime for which he or she was committed . . . ." The *Jackson* court interpreted the term "penalties and disabilities" to include use of the offense or crime for impeachment in a later proceeding. (177 Cal.App.3d at pp. 711-713.) The court explained, "Welfare and Institutions Code section 1772 manifests a strong public policy that those persons honorably discharged from the Youth Authority have been rehabilitated and should no longer suffer the 'penalties and disabilities' of past indiscretions, including . . . impeachment by former offenses. We find nothing in Proposition 8 indicating an intent to abrogate the effacement provisions of Welfare and Institutions Code section 1772." (*Id.* at p. 713.)

*Jackson* is distinguishable on the facts. In *Jackson*, the parties stipulated that "a valid order of dismissal had been entered as to appellant's prior convictions pursuant to [Welfare and Institutions Code] section 1772." (*People* v. *Jackson, supra*, 177 Cal.App.3d at p. 711.) For Welfare and Institutions Code section 1772 to apply, there must have been an honorable discharge by the Youthful Offender Parole Board. Here, the record is silent on that issue. Thus, we need not decide whether *Wheeler* has abrogated the holding of *Jackson*. The issue is not properly before us.

The People assert that the trial court did not permit the impeachment with prior juvenile *adjudications*. The People claim that in ruling on Lee's pretrial motion, the court stated that the conduct underlying such offenses could

---

[8]"Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding." (Cal. Const., art. I, § 28, subd. (f).)

come in under *Wheeler*.[9] However, in soliciting Lee's admission of prior acts of burglary and theft, defense counsel gratuitously referred to the juvenile adjudications as convictions.

In response, Lee notes that the court did not limit its ruling to evidence of conduct. The court stated, "But I think I would limit the District Attorney to examining the defendant if he takes the stand and testified: Is it true that you have *admitted* in the past to having committed a burglary, and a grand theft person *in a judicial proceedings*?" (Italics added.) The court further stated, "So, in my view, [Lee] should be impeached with them and the fact that he has admitted to that conduct."

We conclude that under *Wheeler*, at least in cases which do not fall under Welfare and Institutions Code section 1772, the prosecution may introduce prior conduct evincing moral turpitude even if such conduct was the subject of a juvenile adjudication, subject, of course, to the restrictions imposed under Evidence Code section 352 and other applicable evidentiary limitations.

In any event, this is not a case in which the evidence was so closely balanced that any error was necessarily prejudicial. The prosecution presented overwhelming evidence of Lee's guilt. Lee's testimony, and hence his credibility, was important to the defense; however, the case did not turn solely on Lee's credibility. Other evidence supported the implausibility of Lee's version of the events. The prosecutor introduced into evidence the clothing Young wore on the evening of the shooting to demonstrate that Young had nowhere to conceal a weapon. Thus, the physical evidence contradicted Lee's story. No evidence corroborated Lee's story that he saw a gun in Young's hand before firing at Young. Moreover, Lee had never told the police he had seen a gun in Young's hand before the shooting. Immediately after the shooting, Lee took flight. After his arrest, Lee lied to the police and exhorted his friends to lie also. Such conduct could be used to show his consciousness of guilt. We conclude any error was harmless.

---

[9]The court stated, "So, the way it would come up is under *People* versus *Wheeler*, which is a past conduct showing moral turpitude, which would be used to impeach the credibility of witnesses. . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

"It's my understanding of the law that now conduct showing moral turpitude would be admissible. It is also my understanding of the law under [Evidence Code section] 352, I can control the evidence in those regards, so they won't have miniature trials within this larger trial."

## VII, VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Ramirez, P. J., and McKinster, J., concurred.

A petition for a rehearing was denied October 28, 1994, and appellant's petition for review by the Supreme Court was denied January 19, 1995.

*See footnote, *ante*, page 1724.