Filed 7/9/15  P. v. Morales CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>NARCISO TORRES MORALES,<br><br>    Defendant and Appellant. | F068205<br><br>(Super. Ct. No. MCR039200)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Mitchell C. Rigby, Judge.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Narciso Torres Morales (defendant) stands convicted, following a jury trial, of assault with a firearm on a peace officer, involving the personal use of a firearm (Pen. Code,[1] §§ 245, subd. (d)(1), 12022.5, subd. (a), 12022.53, subd. (b); counts 1-5), obstruction of an executive officer, involving the personal use of a firearm (§§ 69, 12022.5, subd. (a); counts 6-10), possession of a firearm by a person previously convicted of a specified misdemeanor (former § 12021, subd. (c)(1), now § 29805; count 11), possession of ammunition by a person prohibited from possessing a firearm (former § 12316, subd. (b)(1), now § 30305, subd. (a); counts 12 & 17), possession of an assault weapon (former § 12280, subd. (b), now § 30605; counts 14 & 15), and possession of shurikens (former § 12020, subd. (a)(1), now 22410; count 16).[2] Following a bifurcated court trial, defendant was found to have suffered a prior juvenile adjudication for a strike offense (§ 667, subds. (b)-(i)), and he was sentenced to a total unstayed term of 63 years 4 months in prison.

On appeal, we hold: (1) The evidence was sufficient to establish defendant's conduct rose to the level of an assault, as required for counts 1 through 5; and (2) The evidence was sufficient to sustain the convictions on counts 5 and 10, in which Officer Yang was the named victim; but (3) The evidence was insufficient to establish defendant's juvenile adjudication constituted a strike. We reverse the strike finding and remand the matter for resentencing.

---

[1]    All statutory references are to the Penal Code unless otherwise stated.

[2]    Defendant's convictions arose out of two cases, Nos. MCR039200 and MCR039261B, that were consolidated upon the People's motion. Defendant was charged in count 13 with escape from jail. (§ 4532, subd. (b)(1).) This count was dismissed, also on the People's motion.

# FACTS

At approximately 2:30 a.m. on October 22, 2010,[3] Officer Gaona of the Madera Police Department was on patrol in a marked vehicle when he observed a red Toyota Corolla with no front license plate. The vehicle turned; Gaona noticed it also lacked a rear license plate. He activated his overhead light bar to initiate a traffic stop due to the Vehicle Code violations. The Toyota continued on for a little while, then yielded to the right side of the roadway.

Gaona got out of his vehicle and approached defendant, who was the driver and only occupant of the Toyota.[4] Defendant provided identification and the vehicle registration at Gaona's request, then Gaona relayed some of that information to dispatch via radio. He particularly wanted to make sure the vehicle identification number on the registration matched what was on the car's front dash.

Gaona observed a red metal pipe about two feet long and an inch and a half in diameter on the passenger side floorboard, with one end sticking out toward defendant. Gaona told defendant not to grab it and asked why he had it. Defendant said he found it in the roadway and wanted to use it for his weight bench. When Gaona asked how he was going to use it for a weight bench, defendant, who appeared to be searching for an answer, could not provide one.

Gaona, who was waiting for dispatch to get back to him with the requested information, grew cautious of defendant's actions. Defendant appeared to be very nervous and apprehensive about something. When he reached into the glove box to retrieve some paperwork, he leaned his left shoulder toward the right side of his body, then dropped his left hand toward his waist or the center console area. Out of concern for

---

[3] All dates in the statement of facts are from the year 2010.

[4] The entire incident was recorded by Gaona's in-car camera. The video recording was played for the jury.

3.

his own safety, Gaona directed defendant to put his hand on the steering wheel where Gaona could see it.

Defendant did as Gaona directed, but still appeared hesitant and nervous. Because of how defendant was acting, Gaona asked him to step out of the car due to safety concerns. Gaona directed defendant to face the V-shaped gap created by the open driver's door, but defendant tried to face Gaona. Gaona grabbed one of defendant's hands and guided him to face away from Gaona as defendant stepped out so defendant would not be in a position to lunge at the officer.

Gaona was able to get defendant to face the gap, then he grabbed both of defendant's hands and advised him that for officer's safety, he was going to conduct a pat search. Defendant said it was not necessary. Gaona said he was going to do it for safety purposes. At that point, Gaona had defendant's hands behind defendant's back, one in each of his own hands, and was putting them together. Defendant asked Gaona to release his hands so he could place the vehicle keys, which were in his left hand, in the car. Gaona, who was concerned defendant was trying to better position himself, told him just to drop the keys where they were at. Defendant dropped the keys, whereupon Gaona grabbed the fingers of both hands in Gaona's left hand and told defendant to spread his feet. Gaona then conducted a pat search with his right hand.

Gaona discovered a large K Bar knife through a belt loop on the right side of defendant's pants.[5] He directed defendant to leave it there and continued his search. As he started to search the left part of defendant's waist area, defendant pulled out of his grasp. Gaona immediately grabbed the knife with his right hand to make sure defendant did not try to pull it out, while with his left hand, he edged defendant toward the car and radioed for assistance. He told defendant to put his hands behind his back so Gaona

---

[5]     Such a knife is issued by the United States Marine Corps. Its overall length is approximately 10 inches, with the blade six or seven inches long.

4.

could pat search him for officer safety, but defendant refused. He said he felt it was not necessary and he was not going to do it.

After a few minutes, Gaona saw two patrol cars heading his direction. He shined his flashlight at them to let them know his location. Defendant also looked in their direction, then lunged into the car. Gaona, who was still holding onto the knife, grabbed defendant and tried to yank him out. Defendant grabbed the steering wheel and clawed his way into the car. Worried defendant was reaching for something in the center console area that had concerned Gaona originally, Gaona grabbed hold of defendant and jumped into the car with him. Defendant landed across the front seats, then Gaona jumped on top and dropped his weight onto defendant's body and tried to reach for his hands, which were underneath defendant.

Gaona kept telling defendant to put his hands behind his back and trying to grab his arm to force it behind his back so he could handcuff defendant, but he was unsuccessful. When Officers Alva and Boehm arrived, Alva went through the front passenger-side door, while Boehm came through Gaona's side, the front driver's-side door.[6] Gaona told them defendant had a knife, whereupon Alva, who had been trying to get control of defendant's arm, began to strike defendant with her elbow in the head and neck area. If anything, it seemed like defendant started to fight harder. Boehm grabbed the knife, which was in a sheath on defendant's belt on his back, and tossed it out of the car.

Gaona was trying to grab at defendant's hand from underneath. As Gaona inched his hand up defendant's wrist and onto his hand, he realized defendant had a revolver in his left hand. Gaona felt the gun with his own hand, and yelled to the other officers that

---

[6]     Officer Palazzola arrived shortly after Alva and Boehm. Officer Yang arrived at about the same time as Palazzola.

5.

defendant had a gun.[7]  Shortly after, Palazzola heard defendant yell, in a very angry tone of voice, that he had a gun.[8]

Boehm reached underneath defendant to try to help Gaona.  He could feel that the gun was tight against defendant's abdomen, but the barrel was pointed toward Boehm's groin.  When Boehm lost his grip on the gun, he started hitting defendant in the lower back, trying to do anything to get defendant to let go of the gun.  Meanwhile, Yang entered the car through the rear driver's-side door and attempted to assist Boehm by reaching for defendant's arms.  When Yang could not reach for defendant's arms due to the limited amount of room in the vehicle, he began punching and elbowing defendant's lower back, through the space between the bucket seats, in an unsuccessful attempt to get him to surrender.

Hearing defendant had a gun, Palazzola decided the best course of action would be to shoot him, because Palazzola believed all the officers' lives were in imminent danger.  He put his gun close to defendant's back and told Gaona he was going to shoot, but Gaona told him not to, because his arms were underneath defendant.  Palazzola then tased defendant in the back.  He cycled the Taser twice, with each cycle lasting about five seconds.  Although defendant grunted like he was in pain, he did not stop struggling or give up the gun.  Palazzola then directed the other officers to begin hitting defendant.  Palazzola went to the front passenger side and started kicking defendant in the face or head.  Palazzola was in fear for his life.  Alva also began kicking defendant in the head.

---

[7]  Because Gaona had been unable to complete the search of defendant's person, he could not tell whether the gun came from defendant's body or from inside the vehicle.

[8]  Gaona did not hear this.  Alva recalled defendant looking up at her with "a really crazy look," and saying, "I've got a fucking gun," before Gaona made the announcement.  The look was one of desperation, like he was really fighting to hurt them, and the tone of voice was very angry and aggressive.  Alva struck defendant over the head with her Taser, causing the Taser cartridge to pop off.

Boehm started elbowing defendant in the lower back. Yang reentered the vehicle and began punching and elbowing defendant in the lower back again, but to no avail.

As Gaona was trying to remove the gun from defendant's hand, he felt defendant forcefully trying to keep it, and to maneuver the gun as it was underneath the two of them. When Alva was kicking defendant, Gaona felt defendant make a very forceful move of the gun in an upward direction, toward where Gaona's and defendant's heads and Alva were. Gaona kept telling defendant to let go of the gun and put his hands behind his back, but defendant did not respond or comply. Based on defendant's actions, Gaona felt defendant was trying to shoot Gaona or one of the other officers. Defendant was fighting to keep possession of the gun and also to maneuver it.[9]

When the kicks to defendant's head were not effective in getting defendant to release the gun, Alva touch-tased defendant's neck.[10] Defendant yelled, at which point Gaona was able to pull the gun from his grasp. It was a Smith and Wesson .38-caliber revolver containing six bullets, meaning it was fully loaded. The gun subsequently was determined to be operable.

Defendant refused to comply with Gaona's orders to put his hands behind his back, and physically resisted Gaona's and Alva's attempts to gain control of his hands.

---

[9] Gaona and Boehm described the movement of the gun with reference to the face of a clock. When Boehm first felt the gun, the barrel was pointing toward the driver's-side door, in the number 6 position. According to Gaona, the gun initially was pointing toward the number 3 position, which was toward the right side of Gaona's body. At the time defendant made the surge, Gaona felt the barrel move toward the number 2 position. Yang, who was in the rear driver's seat of the car, was in the number 3 position. Palazzola, who was in the rear passenger's seat, was between the number 1 and number 2 positions. Alva, who was at the front passenger-side door, was in about the number 12 position. Gaona's head was also pointing toward the number 12 position.

[10] When Palazzola used his Taser, the device shot two probes that were designed to stick into a person's body. In Alva's case, the cartridge that projected the probes had come off, allowing two metal prongs at the end of the Taser to emit an electrical discharge directly in contact with defendant's skin.

Ultimately, Gaona performed an elbow strike on defendant's back, after which Gaona was able to handcuff defendant. Alva and Palazzola then pulled defendant out of the car and laid him on the ground, and Palazzola searched him. Palazzola found a round of .223-caliber ammunition in one of defendant's pants pockets. In the Toyota's trunk were three clips containing a total of 30 rounds of .223-caliber ammunition, and two empty clips.

Defendant was taken to the hospital for medical clearance before being booked into jail. Boehm was with him the entire time there. Defendant said nothing, but his demeanor gave the impression he was depressed, angry, and pouting about having lost his battle with the officers.

Sometime later, defendant was mistakenly released from jail. On October 27, a four-officer team responded to Oakhurst, where defendant lived, in an attempt to reapprehend him. Defendant, who was standing next to the red Toyota in a supermarket parking lot, was taken into custody without incident. Two live 12-gauge shotgun shells were found in his pocket.

Defendant directed the officers to the property where he was residing, which was fairly secluded. The location had a primary residence with a large, dilapidated building next to it. As the officers were walking up the driveway, they contacted Ramon Morales, defendant's father, coming out of the primary residence. Upon being informed defendant had given consent to search his (defendant's) bedroom, Morales directed them to that location, which was in the large building. A box of .243-caliber ammunition was found inside the structure. Asked if he had any weapons at the house, particularly anything .243-caliber or 12-gauge, Morales replied he did not. Morales said all he owned were two .22-caliber rifles, one of which was inoperable. He showed the officers the rifles and gave them permission to search his residence. No other firearms or ammunition were found in the primary residence.

8.

There were several vehicles parked up the hill on the property. Morales said all belonged to him. Officer Harlow walked up to one of the vehicles — a Chevrolet S-10 pickup — and observed a stack of weapons on the seat through the driver's window. Morales said the weapons did not belong to him, and he did not know how they got in the truck or why they were in there. He told Harlow to go ahead and take them.

As Harlow opened the door to the pickup, he heard a noise and saw defendant, who was handcuffed, running away.[11] The officers gave chase, but defendant disappeared. The ensuing manhunt was unsuccessful. However, in defendant's wallet (which had been seized when he was searched incident to the arrest) was a handwritten agreement selling the pickup to defendant. According to Morales, it was defendant's pickup; no one else drove it.

Harlow subsequently inventoried the weapons taken from the truck. There was a 7.62-caliber SKS assault rifle, a .223-caliber AR-15 receiver, a Ruger mini 30 rifle, a Charles Daley pump action 12-gauge shotgun, and a Montgomery Ward .243-caliber rifle. There was also an assortment of magazines, ammunition (including .38-, .223-, and 7.62-caliber), and knives, as well as three shurikens (Ninja or throwing stars).

Defendant turned himself in several months later.

## DISCUSSION

Defendant challenges the sufficiency of the evidence to sustain his convictions on counts 1 through 5 and 10, and the trial court's determination his juvenile adjudication constituted a strike. The applicable legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the

---

[11] Defendant had been transported to the location in a patrol vehicle. Because the vehicle had to get back into service, defendant was moved to an undercover vehicle that did not have an enclosed cage and in which the back doors could be opened merely by using the handle. Although an officer had been left in charge of keeping an eye on defendant, the officer had come over to Harlow's location to look at the guns.

judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime or sentence allegation beyond a reasonable doubt. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1067; *People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1132-1133; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

# I

## THE SUBSTANTIVE OFFENSES

Defendant contends his convictions on counts 1 through 5 (assault with a firearm on each officer present) must be reversed because his conduct did not rise to the level of an assault. He argues the police intervened before it was known whether his lunging into the car and grabbing the gun would develop into assaultive behavior. He says he may only have been trying to hide the gun, and it was "extremely unlikely" his movement of the weapon was volitional. Defendant further contends his convictions on counts 5 and 10 (assault with a firearm on a peace officer and resisting an executive officer, respectively, both with Yang the named victim) must be reversed because there was no evidence he was aware of Yang's presence. We reject these claims.

Subdivision (d)(1) of section 245 prescribes the punishment for "[a]ny person who commits an assault with a firearm upon the person of a peace officer …, and who knows

or reasonably should know that the victim is a peace officer … engaged in the performance of his or her duties, when the peace officer … is engaged in the performance of his or her duties .…"

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "An assault is an incipient or inchoate battery; a battery is a consummated assault." (*People v. Colantuono* (1994) 7 Cal.4th 206, 216.) Assault is a general intent crime (*People v. Williams* (2001) 26 Cal.4th 779, 788 (*Williams*)); it "does not require a specific intent to injure the victim. [Citation.]" (*Ibid.*) The "mens rea is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery." (*People v. Colantuono*, *supra*, 7 Cal.4th at p. 214.) "[I]t is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault. There is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay.… 'There need not even be a direct attempt at violence; but any indirect preparation towards it, … such as drawing a sword or bayonet, or even laying one's hand upon his sword, would be sufficient.' [Citation.]" (*People v. Chance* (2008) 44 Cal.4th 1164, 1172.) "One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on *use* of a [firearm] …, whether the victim in fact suffers any harm is immaterial. [Citation.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

We have set out the evidence adduced at trial, *ante*, and need not repeat it. The testimony of the various officers concerning defendant's actions and demeanor were sufficient to permit a rational trier of fact to infer defendant grabbed the gun and volitionally sought to move it in order to use it against the officers, and thereby committed assault with a firearm on each of them.

"'Once a defendant has attained the means and location to strike immediately he has the "present ability to injure." The fact an intended victim takes effective steps to

avoid injury has never been held to negate this "present ability."' [Citations.]" (*People v. Chance*, *supra*, 44 Cal.4th at p. 1174.) Here, defendant's grabbing a fully loaded firearm and maneuvering it in close quarters with the officers "gave him the means and the location to strike 'immediately' at [those officers], as that term applies in the context of assault." (*Id*. at pp. 1175-1176.) When, as the testimony in the present case reasonably established, "a defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Id*. at p. 1172.)

We recognize jurors could have concluded defendant was merely attempting to hide the gun and/or that his movement of it was not volitional. This does not render the evidence insufficient to sustain the convictions on counts 1 through 5, however. "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.)

Defendant says the evidence nevertheless failed to show he was aware of Yang's presence; hence, the convictions on counts 5 and 10 must be reversed. With respect to the violation of section 245, subdivision (d)(1) of which he was convicted in count 5, he points primarily to the following passage in *Williams*, *supra*, 26 Cal.4th at pages 787-788:

> "[A] defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' [Citation.] Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery. [Citation.] In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would

12.

directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (Fn. omitted.)

With respect to the violation of section 69 of which he was convicted in count 10, defendant says an accused must "'knowingly resist[]'" (*People v. Smith* (2013) 57 Cal.4th 232, 241 (*Smith*) and must have "'a specific intent to interfere with the executive officer's performance of his duties ....' [Citations.]" (*People v. Nishi* (2012) 207 Cal.App.4th 954, 967 (*Nishi*).)[12]

A number of cases inform our conclusion the evidence was sufficient to sustain the convictions on counts 5 and 10.

In *People v. Lee* (1994) 28 Cal.App.4th 1724, the defendant was convicted of attempted murder of Young, at whom he shot, and assault with a firearm on Green, who was one of Young's companions. (*Id*. at p. 1728.) In upholding the assault conviction, the Court of Appeal found the evidence undisputed Lee was aware of the presence of the group (which included Green) who were near Young, and found the jury reasonably could conclude the defendant intended to harm not only Young, but also some or all of his companions. (*Id*. at pp. 1735-1736.) The court noted that because assault with a

---

**12** Section 69 prescribes the punishment for "[e]very person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty ...." The statute "'sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty.' [Citation.]" (*Smith*, *supra*, 57 Cal.4th at p. 240.) The first way does not require the actual use of force or violence. (*Ibid*.)

Defendant quotes from a portion of *Smith* that deals with the second way of violating section 69. The jury here was instructed only on the first way. Since *Nishi* dealt with the first form of a violation of section 69, however, this discrepancy does not affect defendant's argument or our analysis.

13.

firearm is a general intent crime, "a defendant need not intend to commit violence against a specific victim to be guilty of an assault. [Citations.]" (*Id*. at p. 1736.)

In *People v. Tran* (1996) 47 Cal.App.4th 253 (*Tran*), the defendant chased a man with a knife. The man was holding a baby. The defendant was convicted of two counts of assault with a deadly weapon. (*Id*. at pp. 257, 261.) In upholding the conviction for assault on the baby, the Court of Appeal read *People v. Colantuono*, *supra*, 7 Cal.4th 206, "to mean that an intent to do an act which will injure any reasonably foreseeable person is a sufficient intent for an assault charge." (*Tran*, *supra*, at p. 262.)

In *People v. Raviart* (2001) 93 Cal.App.4th 258, Officers Keller and Wagstaff separated as they approached defendant in an attempt to arrest him outside his motel room. As Keller came around the corner, he saw defendant pointing a handgun directly at him. He also heard Wagstaff yell "'Gun.'" Both officers fired at the defendant. (*Id*. at pp. 264-265.) In rejecting the defendant's claim he could not be convicted of assault with a firearm on Wagstaff because he only pointed the gun at Keller (*id*. at p. 262), the Court of Appeal stated: "[T]he jury could have found beyond a reasonable doubt that when defendant was confronted by the two police officers outside the motel, he drew a loaded handgun … with the intent to shoot both officers, but he only managed to point it at one of the officers before they both shot him. By drawing the gun with the intent to shoot the officers, defendant performed an overt act sufficient to constitute an assault on both of them. Defendant did not have to perform the further act of actually pointing the gun directly at Officer Wagstaff to be guilty of assaulting Wagstaff. It was enough that defendant brought the gun into a position where he could have used it against Wagstaff if the officers had not shot him first." (*Id*. at p. 266.)

In *People v. Hayes* (2006) 142 Cal.App.4th 175, the defendant resisted his probation officer's attempt to arrest him for a probation violation. When other officers arrived to assist, the defendant kicked a concrete ashtray that was next to one of them, knocking it over and striking the officer in the shin. (*Id*. at p. 179.) The defendant was

14.

convicted of battery with injury on the officer. (*Id*. at p. 178.) The Court of Appeal upheld the conviction, stating: "Substantial evidence supports the jury's implied finding that appellant had the required mental state for battery. A reasonable trier of fact could find beyond a reasonable doubt that appellant intentionally kicked the ashtray with great force knowing [the probation officer] was standing beside the ashtray. Based on these findings, a reasonable trier of fact could further find beyond a reasonable doubt that appellant knew facts sufficient to establish that his intentional act 'would directly, naturally and probably result in a battery' by causing the ashtray to fall on [the officer]. [Citation.] Appellant concedes that he intentionally kicked the ashtray with the purpose of knocking it over. It is of no consequence whether he may have honestly believed that his intentional act was unlikely to result in a battery. [Citation.]" (*Id*. at p. 180.)

In *Williams*, *supra*, 26 Cal.4th 779, the defendant fired a shot at King's truck, knowing King was crouched approximately 18 inches away from the rear of the vehicle. The defendant testified he never saw King's sons before he fired, and only noticed them afterwards standing on a curb outside the immediate vicinity of King's truck. King, on the other hand, testified both boys were getting into the truck when the defendant fired. The jury convicted the defendant of assaulting King with a firearm, but deadlocked on charges he assaulted the boys with a firearm and shot at an occupied motor vehicle. (*Id*. at pp. 782-783.) The California Supreme Court held that while assault does not require a specific intent to cause injury or a subjective awareness of the risk an injury might occur, it requires "an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Id*. at p. 790.) In light of that requirement, the court found erroneous an instruction that merely required the jury to find the defendant willfully and unlawfully committed an act that, by its nature, would probably and directly result in physical force being applied to the person of another, because it could permit a conviction premised on facts the defendant should have known but did not actually know.

15.

(*Ibid.*) The court found the instructional error harmless in light of the defendant's admission he knew King's whereabouts and the jury's deadlock on the counts in which the defendant denied actual knowledge that the victims were near the vehicle when he fired. (*Ibid.*)

In *People v. Miller* (2008) 164 Cal.App.4th 653, the defendant drove her car onto a bicycle path, causing people to have to jump out of the way. Eventually, she struck a jogger, then drove a little farther before stopping. Upon emerging from her vehicle, the defendant said, "'I didn't see him.'" An officer described her as incoherent, dazed, and unsure where she was or what had happened. Her personal physician testified she suffered from a longstanding medical condition that could have caused disorientation. (*Id.* at pp. 658-659, 664.) In instructing on the charge of assault with a deadly weapon, the trial court told the jury, in part, that the person committing the act had to be aware of facts that would lead a reasonable person to realize that as a direct, natural, and probable result, physical force would be applied to another person. In response to a question from the deliberating jury, however, the court said there was no ""'"awareness"'"" element. (*Id.* at p. 661.) The Court of Appeal found "clear error" under *Williams* (*People v. Miller*, *supra*, at p. 663), and found the error prejudicial because the jury could have believed the defendant was unable accurately to perceive her surroundings due to a condition not caused by voluntary intoxication, and so could have concluded she was unaware of facts that would lead a reasonable person to realize that battery would directly, naturally and probably result from her conduct (*id.* at p. 664).

In *People v. Riva* (2003) 112 Cal.App.4th 981 (*Riva*), the defendant fired a gun from inside his car at the occupants of a vehicle, missing his intended targets but wounding a pedestrian. (*Id.* at p. 986.) The Court of Appeal found the instruction on assault with a deadly weapon defective under *Williams*, but concluded the error was harmless beyond a reasonable doubt because the shooting took place in an urban neighborhood consisting of residences and small businesses, at a time of day when people

were normally returning home from work, school, or shopping, and there were other pedestrians and numerous vehicles in the area when the shooting occurred. Those facts, the court reasoned, "would lead a reasonable person to realize if he fired a gun at someone in a car at this time of day in this kind of neighborhood the bullet could strike a pedestrian and a battery would directly, naturally and probably result from his conduct." (*Riva*, *supra*, at p. 998, fn. omitted.) The court further held that "even under [*Williams*'s] 'actual knowledge' test when the defendant shoots into a crowd the People do not have to prove he was aiming at a particular target." (*Ibid*.) "The defendant need not intend to strike any particular person to be guilty of [assault with a deadly weapon]. Rather, when the defendant shoots into a group of persons primarily targeting only one of them, the defendant can be convicted of assault with a deadly weapon as to the nontargeted members of the group." (*Id*. at p. 999, fns. omitted.)

In *People v. Felix* (2009) 172 Cal.App.4th 1618 (*Felix*), the defendant contended the evidence was insufficient to support his convictions for assault with a firearm on his girlfriend's school-age brother and sister. (*Id*. at pp. 1627, 1630.) The Court of Appeal found the statement in *Tran*, that an intent to do an act that will injure any reasonably foreseeable person is a sufficient intent for an assault charge, to be valid under *Williams*. (*Felix*, *supra*, at p. 1628.) The court rejected the defendant's attempt to distinguish cases such as *Tran* and *Riva* as involving secondary victims whose presence was readily apparent to the perpetrator, explaining: "[N]o subjective intent to injure a particular victim is required. Rather, a defendant's intended acts are evaluated objectively to determine whether harm to a charged victim was foreseeable. [Citation.]" (*Felix*, *supra*, at p. 1629.) The court continued: "While not every shooting into a car or building will satisfy the 'actual knowledge' requirement of *Williams*, here [the defendant] had detailed, intimate knowledge of the house and inhabitants. He *actually knew* he was endangering the lives of three or more members of the family when he fired into the house.… The evidence is sufficient to support the jury's implied finding that [the defendant] knew it

17.

was highly likely that [the victims] were in the house at the time he fired the gunshots. He thus knew that his acts would 'probably and directly result in physical force' against them. [Citation.]" (*Id.* at p. 1630.)

In *People v. Trujillo* (2010) 181 Cal.App.4th 1344, the defendant fired several shots at a car that had tinted windows. On appeal, he contended the evidence was insufficient to convict him of two counts of assault, because he had no knowledge there was a passenger in the backseat of the car. (*Id.* at pp. 1347-1349.) Relying largely on *Felix*, *Riva,* and "zone of harm" or "kill zone" cases such as *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), *People v. Vang* (2001) 87 Cal.App.4th 554 (*Vang*), and *People v. Adams* (2008) 169 Cal.App.4th 1009 (*Adams*), the court stated:

> "[A] defendant who harbors the requisite mental state for assault while committing one or more acti rei such that a direct, natural, and probable result is a battery against two persons may be convicted of assault against each. Here, there is no dispute that the firing of multiple gunshots from a semiautomatic weapon at [a vehicle] is an 'action [or are actions] enabling him to inflict a present injury' on anyone inside [that vehicle], thus constituting an actus reus or multiple acti rei of assault. [Citation.] Nor is it reasonably disputed that defendant had the requisite mental state for assault required by *Williams*: he was actually aware that he was shooting at an occupied car in a manner that would lead a reasonable person to realize that a battery against another would directly, naturally, and probably result. [Citation.] Even if he was not actually aware of the second person in the [vehicle], his mental state can be 'readily combine[d]' with the actus reus (or acti rei) of shooting at the car with two people inside to '"multiply the criminal acts for which the [defendant] is responsible."' [Citation.] Just as 'a person maliciously intending to kill is guilty of the murder of all persons actually killed' [citation], *a person who harbors the requisite intent for assault is guilty of the assault of all persons actually assaulted.* [Citations.]
>
> "Because the gravamen of assault is the likelihood that the defendant's action will result in a violent injury to another [citations], it follows that a victim of assault is one for whom such an injury was likely. [The person] sitting in the backseat of the [vehicle] nearest to defendant's fusillade of gunshots, was no less a victim of defendant's assault than the driver .… Therefore, defendant can be charged with and convicted of

18.

assault against both occupants of the car even if defendant did not actually see [the person] in the backseat.

"Support for this view can be found in cases involving acts of violence that create a zone of harm encompassing multiple potential victims.  [Citations.]…  [¶] … [¶]

"*Vang* and *Adams* involved attempted murder convictions, not assault.  Nevertheless, if the defendants in *Vang* and *Adams* harbored the specific intent to kill people inside buildings when they were unaware that such persons were in the buildings, it would be absurd to find that they did not also have the mental state required to be convicted of assault against those same victims; the specific intent to kill everyone in a building by shooting them (*Vang*) or burning them (*Adams*) necessarily includes an awareness of facts (shooting into or burning an occupied residence) such that a reasonable person would realize a battery against such persons would directly, naturally, and probably result from his or her conduct.  Here, defendant had the requisite mental state for assault and essentially created a zone of harm inside the [vehicle] when he shot a flurry of bullets at it.…

"Even if the 'elastic' mens rea concept described by *Bland* or the kill zone theory does not apply here, we would conclude that [the backseat passenger] was a reasonably foreseeable victim of defendant's assault under the rationale expressed in *Felix* and *Riva*.  The jurors could have reasonably found that a person with actual knowledge that he is shooting indiscriminately at a moving vehicle would realize that his conduct would directly, naturally, and probably result in a battery to anyone and everyone inside the [vehicle].  Passengers in cars are no less foreseeable than the pedestrian who was hit in *Riva*." (*People v. Trujillo*, *supra*, 181 Cal.App.4th at pp. 1354-1357, fns. and original italics omitted, italics added.)

In *People v. Velasquez* (2012) 211 Cal.App.4th 1170, this court considered a case in which the defendant, who shot at a garage 10 times, was charged with a count of assault with a firearm for each person inside the residence at the time of the shooting.  On appeal, the defendant conceded he had no grounds to challenge the count involving Maria, who was inside the garage, but he claimed the remaining four counts had to be reversed because the instructions improperly allowed the jury to convict him of those counts simply because Maria was at risk of being struck by a bullet.  (*Id*. at p. 1175.) While noting evidence supported but did not compel a conclusion no one but Maria was

19.

in any danger, we agreed with the defendant that the instructions and arguments of counsel did not clarify the requirement that each victim must have been subject to the application of force, or explain to the jury that it must conclude beyond a reasonable doubt that the bullets fired by the defendant would directly and probably result in application of force to the victim named in each count. (*Id*. at p. 1177.)

None of the foregoing cases is directly on point. Some antedate *Williams*, and many involve situations in which a gun actually was fired. Nevertheless, our consideration of them leads us to conclude that, under the circumstances shown by the evidence in this case, defendant did not have to be aware that his acts by their nature would probably and directly result in physical force being applied specifically to *Yang*. Similarly, he did not have to knowingly resist *Yang* or have a specific intent to interfere with *Yang's* performance of his duties. The evidence was sufficient to sustain the convictions on counts 5 and 10 because it reasonably gave rise to the inference (1) defendant was aware of Yang's presence, in the sense he knew another officer was there, because Yang punched and elbowed defendant multiple times on two separate occasions[13]; (2) defendant intended to fight with, resist, and interfere with *any and all* of the officers present, and (3) given the close confines of the car and defendant's knowledge he had his hand on a loaded firearm, was engaged in a struggle with multiple

---

[13]    As the trial court observed in denying defendant's section 1118.1 motion, "And while inside the vehicle, [Officer Gaona] discovers that the defendant has a firearm. And it is … the existence of that firearm, a loaded firearm, and apparently an operable firearm, that places all persons in proximity — and I would say, then, all persons within that Toyota vehicle during the course of the struggle — at risk of serious injury or death arising out of the possible discharge of that firearm. [¶] [Defendant] was, in fact, aware of the presence of Officer Yang. He may not have known it by name, he may not have known it by sight, but Officer Yang mentioned that Officer Yang was one of the officers who struck at the defendant at the time. So the defendant was certainly aware that there was someone there. Whether he knew it was Officer Yang as a person who he could take notice of in a crowd and separate that from others, he still knew that there was a person there."

20.

peace officers, and was attempting to maneuver the gun, he was aware of the facts that would lead a reasonable person to realize a battery would directly, naturally and probably result from his conduct to *each* of the officers present.

## II

## THE STRIKE FINDING

Whether defendant's juvenile adjudication constitutes a strike turns on whether the offense is listed in Welfare and Institutions Code section 707, subdivision (b). Defendant contends, and the Attorney General concedes, the evidence was insufficient to establish this requirement beyond a reasonable doubt. We agree.

### A.    Background

On February 2, 2000, the Madera County District Attorney filed a supplemental juvenile wardship petition pursuant to Welfare and Institutions Code sections 602 and 777, subdivision (a), alleging defendant (then age 17) committed carjacking in which he personally used a knife (§§ 215, subd. (a), 12022, subd. (b)(2); count I), assault with a deadly weapon (§ 245, subd. (a)(1); count II), and various violations of probation (counts III-VI). On February 23, 2000, defendant admitted violating section 215, subdivision (a) as alleged in count I; the special allegation and remaining counts were dismissed on the People's motion. On March 8, 2000, defendant was committed to what was then known as the California Youth Authority (now the California Department of Corrections and Rehabilitation, Division of Juvenile Justice) for an aggregate term of 10 years six months. Of that term, nine years was attributed to the violation of section 215, subdivision (a), which was "deemed" a Welfare and Institutions Code section 707, subdivision (b) matter.

In the present case, the third amended information alleged defendant's adjudication for violation of section 215, subdivision (a) constituted a prior serious or violent felony within the meaning of the "Three Strikes" law (§ 667, subds. (b)-(i)). Defendant filed a written brief in which he argued the strike allegation could not be

21.

proved beyond a reasonable doubt since a carjacking in violation of section 215, subdivision (a) is only a Welfare and Institutions Code section 707, subdivision (b) offense if it was accomplished while the perpetrator was armed with a deadly or dangerous weapon. Because here the juvenile court dismissed the arming allegation, he concluded, the carjacking did not constitute a strike.

At the court trial on the strike allegation, the People submitted as exhibits the juvenile court records that were available.[14] The prosecutor argued the supplemental petition, which contained a section 12022, subdivision (b) allegation, was part of the record of conviction, as was the motion to find defendant unfit pursuant to Welfare and Institutions Code section 707, which contained information defendant used a knife in commission of the carjacking. The prosecutor also pointed out that the minutes of the hearing in which defendant admitted the carjacking stated the offense was deemed to be a Welfare and Institutions Code section 707, subdivision (b) offense, as did the minutes of the dispositional hearing and the Youth Authority commitment. Defense counsel responded that although the petition contained an allegation pursuant to section 12022, subdivision (b), that allegation was dismissed at the time defendant admitted the violation of section 215, subdivision (a). Counsel argued a bare allegation of carjacking is not a Welfare and Institutions Code section 707, subdivision (b) offense, and nothing in the minutes indicated the parties reached an agreement or stipulation the carjacking would be deemed to be such an offense. Because the record was ambiguous, counsel argued, the prosecution could not prove beyond a reasonable doubt that defendant's juvenile adjudication was a strike.

Based on the documentation submitted, the court concluded the People had proven the juvenile adjudication constituted a strike. In particular, the court relied on the

---

**14** These records did not include reporters' transcripts, as the reporters' notes apparently had been destroyed.

22.

March 8, 2000, minute order and the commitment, which referred to the offense being deemed a Welfare and Institutions Code section 707, subdivision (b) matter. The court found it appeared "that was the deal," and how the case "[w]ent forward."

**B.      Analysis**

In order for a juvenile adjudication to be counted as a prior serious and/or violent felony conviction under the Three Strikes law, the following four conditions must be met:

> "(A) The juvenile was 16 years of age or older at the time he or she committed the prior offense.
>
> "(B) The prior offense is listed in subdivision (b) of Section 707 of the Welfare and Institutions Code or described in paragraph (1) or (2) [of subdivision (d) of section 667] as a serious and/or violent felony.
>
> "(C) The juvenile was found to be a fit and proper subject to be dealt with under the juvenile court law.
>
> "(D) The juvenile was adjudged a ward of the juvenile court within the meaning of Section 602 of the Welfare and Institutions Code because the person committed an offense listed in subdivision (b) of Section 707 of the Welfare and Institutions Code." (§ 667, subd. (d)(3).)[15]

Carjacking, in violation of section 215, subdivision (a), constitutes a violent felony under section 667.5, subdivision (c)(17), and a serious felony under section 1192.7, subdivision (c)(27). Accordingly, it is an offense described in section 667, subdivision (d)(1). It is *not* an offense listed in Welfare and Institutions Code section 707, subdivision (b), however, unless it was committed "while armed with a dangerous or deadly weapon." (*Id.*, subd. (b)(25).)

The California Supreme Court has directed that section 667, subdivision (d)(3) be interpreted "according to its terms ...." (*People v. Garcia* (1999) 21 Cal.4th 1, 13.)

---

[15]     Because the third amended information in the present case alleged defendant had a prior strike adjudication only under section 667, subdivisions (b) through (i), the legislative version of the Three Strikes law, we refer only to that statute. The initiative version of the Three Strikes law (§ 1170.12) is in accord (see § 1170.12, subd. (b)(3)).

Thus, "[u]nder paragraph (B), a prior juvenile adjudication qualifies as a prior felony conviction for Three Strikes purposes only if the prior offense is listed in Welfare and Institutions Code section 707[, subdivision ](b) or is classified as 'serious' or 'violent.' Paragraph (D) does not modify or conflict with paragraph (B), but states a separate, additional requirement: the prior adjudication qualifies as a prior felony conviction *only* if the defendant, in the prior juvenile proceeding, was adjudged a ward *because of* at least one offense listed in [Welfare and Institutions Code] section 707[, subdivision ](b)." (*Ibid*., italics added.)

In the present case, although defendant originally was alleged to have used a deadly weapon in commission of carjacking, that allegation was dismissed without ever being admitted or found true. The minutes of the hearing in which defendant made the admission indicate no waiver pursuant to *People v. Harvey* (1979) 25 Cal.3d 754 was entered; moreover, it is questionable whether such a waiver permits a subsequent court to consider a dismissed allegation for purposes of determining whether the offense is one listed in Welfare and Institutions Code section 707, subdivision (b). (See *People v. Bueno* (2006) 143 Cal.App.4th 1503, 1510 [questioning whether *Harvey* waiver permits consideration of allegations of dismissed counts as admitted facts for purposes of determining whether offense was serious felony].) The probation officer's report filed March 6, 2000, in preparation for the dispositional hearing, recited the victim's statement that defendant put a knife to his neck, but stated the maximum term for the offense was nine years. That has always been the aggravated term for carjacking without any enhancements. (See § 215, subd. (b).)

In setting out the violation of section 215, subdivision (a) as the principal term, the probation officer's report stated: "Aggravated term 9 years[,] [¶] felony, deemed a 707(a) W&I matter." This was changed, by hand, to read, "deemed a 707(b) W&I matter." The source of and basis for the change are unknown. Nevertheless, the minutes

24.

of the March 8, 2000, disposition hearing read: "CYA Commitment Charges/Petition: PRINCIPAL TERM: Pet. 12872-E, PC 215(a) felony, 9 years, deemed a 707(b) W&I."

An intake officer at the Youth Authority subsequently wrote the court requesting an amended minute order reflecting whether defendant was an individual with exceptional needs. The letter further stated: "Also, in processing this case, it is noted that the court designated PC215(a) as a 707(b) offense. This would extend the Youth Authority's jurisdiction to age 25. We believe the 707(b) designation is in error and ask the court to review this issue. WIC707(b) shows that PC215, while armed, is a 707(b) offense." On March 22, 2000, the matter was called for transportation review and correction of the minute order. In pertinent part, the minute order from that hearing reads: "Court orders Petition dated 2-2-2000 PC 215(a) 707(b) matter." What appears, from the copy of the order contained in the record on appeal, to be a note is attached; it bears a handwritten arrow and "707(b)."

At all times pertinent, carjacking in violation of section 215, subdivision (a), without more, was not an offense listed in Welfare and Institutions Code section 707, subdivision (b). The record contains no indication of any stipulation by the parties to, or basis for, it being "deemed" such an offense. Even if it could be deemed such an offense for the purpose of extending the Youth Authority's jurisdiction, this does not make it an offense *listed in* Welfare and Institutions Code section 707, subdivision (b) for purposes of rendering it a prior strike.[16]

---

[16] That defendant was committed to the Youth Authority makes no difference. Welfare and Institutions Code section 733, subdivision (c) prohibits such commitment unless "the most recent offense alleged in any petition and admitted or found to be true by the court" is described in Welfare and Institutions Code section 707, subdivision (b) or section 290.008, subdivision (c). (See *In re Greg F.* (2012) 55 Cal.4th 393, 404.) This requirement did not go into effect until September 1, 2007, however. (Welf. & Inst. Code, § 733, subd. (c).)

Moreover, we cannot go behind the bare adjudication to determine from the entire record whether the adjudication involved the commission of a Welfare and Institutions Code section 707, subdivision (b) offense. Even assuming defendant's *conduct* constituted a Welfare and Institutions Code section 707, subdivision (b) offense, the weapon allegation was dismissed without an admission or true finding being made. That being the case, defendant was *not* "adjudged a ward of the juvenile court within the meaning of Section 602 of the Welfare and Institutions Code because" he committed carjacking while armed with a dangerous or deadly weapon. (§ 667, subd. (d)(3)(D).) "Paragraph (D) requires an adjudication of a Welfare and Institutions Code section 707[, subdivision ](b) offense; a showing the conduct includes the elements of such an offense is not adequate." (*In re Jensen* (2001) 92 Cal.App.4th 262, 266.)[17] "The Three Strikes statute is clear: A prior juvenile adjudication cannot be used as a strike unless four conditions are met. (§ 667, subd. (d)(3)(A)-(D).) These conditions include the requirement that the defendant, in the prior juvenile proceeding, was adjudged a ward because he or she committed at least one offense listed in Welfare and Institutions Code section 707[, subdivision ](b). (§ 667, subd. (d)(3)(D).) Furthermore, *People v. Garcia*, *supra*, 21 Cal.4th 1, teaches that the section of the Three Strikes law delineating what prior juvenile adjudications qualify as strikes (§ 667, subd. (d)(3)) should be read narrowly according to its terms." (*Ibid*.)

"In the proceeding leading to the prior juvenile adjudication alleged and imposed against defendant as a prior felony conviction, the only felony offense for which defendant was adjudged a ward of the juvenile court was [carjacking], which is not an

---

**17** Whether the entire record may properly be considered to determine whether the requirement of section 667, subdivision (d)(3)(B) is met, need not concern us. (See *In re Jensen*, *supra*, 92 Cal.App.4th at pp. 267-268; *People v. Fountain* (2000) 82 Cal.App.4th 61, 68-69; see also *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1527-1528.)

offense listed in Welfare and Institutions Code section 707[, subdivision ](b).[18] Although that offense is classified as serious [and violent] and would, therefore, qualify as a strike under paragraph (B) [of subdivision (d)(3), of section 667], the separate requirement of paragraph (D) [of subdivision (d)(3), of section 667], that the juvenile was adjudged a ward of the juvenile court because of a [Welfare and Institutions Code] section 707[, subdivision ](b) offense, was not satisfied. The trial court therefore erred in sentencing defendant under section 667, subdivision (e)(1)." (*People v. Garcia*, *supra*, 21 Cal.4th at p. 15.)

## DISPOSITION

The judgments of conviction are affirmed. The true finding on the prior juvenile strike adjudication allegation is reversed. Sentence is vacated and the matter is remanded for resentencing in accordance with this opinion.

_____

DETJEN, J.

WE CONCUR:

_____

LEVY, Acting P.J.

_____

PEÑA, J.

---

**18** Although subordinate terms for three previous offenses (vehicle theft, attempted escape, and vandalism) were included in the calculation of defendant's aggregate term, none of those offenses are listed in subdivision (b) of Welfare and Institutions Code section 707.