Filed 6/14/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G061077 |
|      v. | (Super. Ct. No. 20CF1661) |
| DARRICK PATRICK OCEGUEDA, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge. Affirmed.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

Darrick Patrick Ocegueda appeals his jury-trial conviction for first degree murder. He contends that the trial court misinstructed the jury on the theory of provocation as it related to the premeditation and deliberation elements of the offense and, relatedly, that his trial counsel was ineffective in failing to seek a clarifying pinpoint instruction. Ocegueda maintains the combination of some of the standard instructions given (CALCRIM Nos. 521, 522 & 570) might have misled the jury to believe that provocation could negate the elements of first degree murder only if it satisfied an objective, "person of average disposition" standard. Additionally, Ocegueda claims the evidence was insufficient to support the elements of premeditation and deliberation.

As discussed below, we conclude the instructions were correct, complete, and unambiguous in instructing the jury on premeditation and deliberation. We further conclude the evidence supported the jury's verdict. Accordingly, we affirm.

FACTS

I. *The Information*

An information charged Ocegueda with the June 2020 murder of Daniel Bahena. The information also alleged that Ocegueda personally used a knife in the commission of the murder for purposes of Penal Code section 12022, subdivision (b)(1), and that he had sustained a prior conviction that qualified as a strike and as a serious felony.

II. *The Evidence at Trial*

On the day of the murder, Bahena and his friend Enrique Morales were drinking and riding their skateboards together around Garden Grove and Santa Ana. In the late afternoon, the two went to a CVS store in Santa Ana to get more alcohol. Ocegueda and a companion, Joanna Santana, were inside the store at the time. While inside the store, Bahena had a conversation with Santana. After all four exited the store, Bahena approached Santana's SUV and exchanged words with Ocegueda, who was sitting in the passenger seat, and the two agreed to fight each other.

2

Ocegueda got out of the SUV, and he, Bahena, and Morales walked behind a nearby store. There, Ocegueda and Bahena started fighting. Ocegueda soon gained the upper hand and placed Bahena in a headlock while continuing to punch him. Morales then stepped in and hit Ocegueda in the head with a skateboard two or three times, causing him to release Bahena. Ocegueda was angry and told Bahena, "'Oh, you fucked up, why you let your homie get in?'" Security camera video showed the group walking behind the store at 4:52 p.m. and Ocegueda retreating about 30 seconds later.

Ocegueda walked back to Santana's SUV and retrieved two knives. Bahena and Morales started "half walking, half running," and Ocegueda returned to the SUV, which began driving in the same direction. Ocegueda saw the pair when they reached the parking lot of Cozy Corner, a fast-food restaurant down the street from CVS. Santana dropped Ocegueda off at a parking lot across the street, and he started running across multiple lanes of traffic toward Cozy Corner. Santana drove away.

Security camera video showed Ocegueda reaching the Cozy Corner parking lot at 4:55 p.m. Ocegueda, who was holding a knife in each hand, charged at Bahena. Bahena hit Ocegueda with his skateboard, and Ocegueda made a slashing or stabbing motion with his right hand. Bahena began retreating, and Ocegueda attempted to slash him with the knife in his left hand, but missed.[1] After Bahena managed to get about three feet away from Ocegueda, he and Morales began running away and separated. In the video, Ocegueda could be seen walking calmly after them, still holding a knife in each hand, and later jogging after Bahena. Bahena ran toward the Grecian Gardens apartment complex, about a quarter of a mile away, and Ocegueda continued after him.

Minutes after the group left the Cozy Corner parking lot, a large man was walking around the lot and then threateningly confronted an apparently unrelated person

---

[1] At trial, Morales testified he thought Ocegueda had punched Bahena, but he admitted he could not see if Ocegueda had anything in his hands because he "came out of nowhere."

holding a skateboard, while Santana's SUV waited nearby. After a brief exchange between the two, the large man entered the SUV, which began driving in the direction of the Grecian Gardens.

In the meantime, Bahena entered the Grecian Gardens courtyard. Security camera video from a nearby apartment showed him talking to two men and showing them a slash wound on his chest.[2] Bahena called his girlfriend and asked her to come get him.

At around 5:08 p.m., Ocegueda approached Bahena with another man. Bahena and the men he had been speaking with ran away in different directions, but Ocegueda and his accomplice caught up with Bahena and stabbed him twice: once in the lower back and once in the chest. The chest wound perforated Bahena's lung and heart. Bahena ran a short distance but collapsed to the ground and died shortly thereafter. Ocegueda and the accomplice fled the scene, but police later identified and arrested Ocegueda.

III. *The Jury Instructions*

After the close of evidence, the trial court gave the jury the standard instructions pertaining to, inter alia, first and second degree murder, the concept of provocation, and voluntary manslaughter based on heat of passion. As relevant here, the court instructed the jury on the elements of murder and informed them that murder is of the second degree, unless the prosecution proved beyond a reasonable doubt that it was first degree murder as defined in CALCRIM No. 521. In turn, CALCRIM No. 521 (first degree murder) provided that Ocegueda was guilty of first degree murder only if he acted "willfully, deliberately, and with premeditation." This instruction further explained that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

---

[2] It is unclear whether Bahena had sustained this wound during his confrontation with Ocegueda at the Cozy Corner parking lot or at a different time.

4

CALCRIM No. 522 (effect of provocation on degree of murder) instructed the jury: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

And CALCRIM No. 570 (voluntary manslaughter: heat of passion) instructed that murder was reduced to voluntary manslaughter if Ocegueda was provoked, acted rashly as a result, and "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." This instruction further provided: "In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. . . . [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] [If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]" In addition, the trial court instructed the jury on a theory of direct aiding and abetting (CALCRIM No. 401).[3]

---

[3] Under the theory of direct aiding and abetting, a defendant can be found guilty of a crime if he or she knew of the perpetrator's unlawful purpose, intended to aid

5

IV. *Closing Arguments*

In its closing argument, the prosecution argued Ocegueda was guilty of first degree murder because he had acted deliberately and with premeditation. The prosecutor noted that Ocegueda did not kill Bahena soon after he was hit with the skateboard, and argued: "With each step that [Ocegueda] took from [the initial fight], he had the opportunity to either abandon his decision to kill or continue forward. At each step [Ocegueda] made additional choices and continued with his decision to kill." The prosecutor said that "[t]here are courses of actions during this 17-minute hunt to kill that an average reasonable person would consider," yet "upon reflection[,] . . . at each turn[, Ocegueda] went ahead and continued towards killing [Bahena]." Later, in arguing that the heat of passion theory of voluntary manslaughter did not apply, the prosecutor reminded the jury: "Do not consider any subjective factors related to [Ocegueda]. If you think that he was hot-headed or jealous, that is not something you can consider. It's the average person."

Ocegueda's trial counsel offered different defense theories in her closing argument, including that Ocegueda did not personally commit the killing, that the killing was accidental, that it was committed in perfect or imperfect self-defense, and that it was committed in a heat of passion. In addition, counsel referenced CALCRIM No. 521's instruction that to be guilty of first degree murder, the defendant must have acted "[w]illfully, deliberately, and with premeditation" and asserted that nothing showed Ocegueda had "weighed the considerations for and against his choice" and that he "was still mad" and "was not thinking clearly" at the time.

V. *The Verdict and the Sentence*

Following trial, the jury found Ocegueda guilty of first degree murder and found the allegation that he personally used a knife in the commission of the offense to be

in the commission of that crime, and did aid in the commission of that crime. (*People v. Chavez* (2018) 22 Cal.App.5th 663, 682.)

6

true. In a bifurcated proceeding, Ocegueda admitted to the prior conviction allegation. The trial court sentenced him to a total of 56 years to life. Ocegueda timely appealed.

DISCUSSION

Ocegueda challenges his conviction for first degree murder, contending: (a) the trial court misinstructed the jury on the theory of provocation as it related to the premeditation and deliberation elements of the offense and, relatedly, his trial counsel was ineffective by failing to seek a clarifying pinpoint instruction; and (b) the evidence was insufficient to support the jury's finding of premeditation and deliberation. As discussed below, we perceive neither instructional error nor ineffective assistance of counsel, and we conclude the evidence amply supported the elements of first degree murder.

I. *The Jury Instructions*

A. *Applicable Principles*

1. *Jury Instructions and the Standard of Review*

"The trial court has a sua sponte duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. [Citation.]" (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331 (*Hernandez*).) Additionally, "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) But "[o]nce the trial court adequately instructs the jury on the law, it has no duty to give clarifying or amplifying instructions absent a request." (*Hernandez*, at p. 1331.)

We review claims of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We assume the jurors are intelligent

7

people and are capable of understanding and correlating the instructions given. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 (*Ramos*).)

2. *Murder and Provocation*

"First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. [Citation.]" (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1332.) A decision to kill is premeditated if considered beforehand and deliberate if resulting from careful thought and weighing of competing considerations. (*People v. Lee* (2011) 51 Cal.4th 620, 636.)

Second degree murder is an unlawful killing with malice, but without the additional elements of premeditation and deliberation. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) A heat of passion arising from provocation can negate those elements and thus reduce the murder to second degree if it precluded the defendant from deliberating or premeditating. (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1332.) This is a subjective test pertaining to the defendant's mental state. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.) Provocation in this context is not a "defense" but merely a theory of reasonable doubt as to required elements of first degree murder. (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1733-1734.) Because an instruction on provocation relates to the legal elements of premeditation and deliberation, it is a "'pinpoint instruction'" that a court need not give on its own motion. (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879.)

If the provocation that drove the defendant to passion also meets an objective criterion—if it is sufficient to cause a person of average disposition to act rashly and without deliberation—the defendant is deemed to have acted without malice and is guilty only of voluntary manslaughter. (*People v. Lasko* (2000) 23 Cal.4th 101, 108 (*Lasko*).) That the defendant was subjectively aroused to passion is insufficient to reduce murder to voluntary manslaughter.

8

B. *Analysis*

We conclude the trial court committed no instructional error. CALCRIM No. 521 properly instructed the jury on the elements of first degree murder, including the requirement that the murder be deliberate and premeditated. It explained that a decision to kill was not deliberate and premeditated if it was made "rashly, impulsively, or without careful consideration," making no mention of an objective standard. CALCRIM No. 522 correctly instructed that provocation may reduce murder from first degree to second degree and may further reduce a murder to manslaughter. Finally, CALCRIM No. 570 accurately instructed that to reduce murder to voluntary manslaughter, the provocation must meet an objective test. Thus, the court did not err in giving these instructions.

The court in *People v. Jones* (2014) 223 Cal.App.4th 995, 1001 (*Jones*), reached the same conclusion when addressing a similar challenge to CALCRIM Nos. 521, 522, and 570, holding that these instructions correctly stated the law. The court explained: "CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' [Citation.] As the jury also was instructed, a reduction of murder to voluntary manslaughter requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment."[4] (*Jones*, at p. 1001.)

---

[4] Ocegueda attempts to distinguish *Jones* on the ground that provocation played a more central role in this case than it did in *Jones*. But the *Jones* court's conclusion that the instructions were correct was not based on the limited role provocation played at trial. (*Jones*, *supra*, 223 Cal.App.4th at p. 1001.)

9

Ocegueda does not dispute that the trial court's instructions were legally correct, on their own, but argues their confluence might have misled the jury to believe that to reduce murder from first to second degree, provocation must meet the same objective test that leads to a reduction to voluntary manslaughter. He contends that CALCRIM No. 522's reference to provocation, without distinguishing between provocation negating malice and provocation negating deliberation and premeditation, implied that a single standard governed, regardless of the context, "and the difference inhere[d] in the amount of provocation present." (Italics omitted.) He asserts CALCRIM No. 570 provided this single standard by: (a) purporting to "define[]" provocation as containing an objective component, and (b) broadly stating that "[t]he defendant is not allowed to set up his own standard of conduct." We are unpersuaded.

As noted, CALCRIM No. 521 instructed that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premediated" and thus does not support a conviction for first degree murder. Nothing suggested that a rash, impulsive, or unconsidered decision could nevertheless be deliberate and premeditated based on some objective test.

Ocegueda's contention that CALCRIM No. 522 implied a single standard for provocation, with a difference only in "the amount of provocation," is illogical. As the Attorney General observes, "either an event is sufficiently provocative to cause an ordinary person [of average disposition] to [act impulsively] or it is not." And as the jury was instructed, if the event was sufficiently provocative to a person of average disposition, and the defendant was subjectively provoked, the defendant is guilty of voluntary manslaughter, not murder. (*Lasko*, *supra*, 23 Cal.4th at p. 108; CALCRIM No. 570.) Under Ocegueda's reading of the instructions, there would be no circumstances under which murder could be reduced from first to second degree based on provocation without being further reduced to manslaughter. Yet CALCRIM No. 522 instructed that provocation could reduce the degree of murder. Thus, the jury would not

10

have understood CALCRIM No. 522 to say that the same standard governed provocation as it related to both the elements of first degree murder and the heat of passion theory of voluntary manslaughter.  (See *Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)

As for CALCRIM No. 570, the language Ocegueda singles out pertained to the provocation necessary "for heat of passion to reduce a murder to voluntary manslaughter."  We see no reasonable likelihood that the jury would have construed this language in a voluntary manslaughter instruction to alter the requirement—plainly stated in CALCRIM No. 521—that first degree murder must be deliberate and premediated. (See *People v. Mitchell*, *supra*, 7 Cal.5th at p. 579; *Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)  The instructions were therefore clear that the existence of deliberation and premeditation, including the theory that they were not present due to provocation, were based on Ocegueda's subjective mental state alone.  Further supporting that conclusion is Ocegueda's trial counsel's reliance on CALCRIM No. 521 to argue that Ocegueda was not guilty of first degree murder based on a subjective standard:  she reminded the jury that the defendant must have acted "[w]illfully, deliberately, and with premeditation" and asserted nothing showed *Ocegueda* had "weighed the considerations for and against his choice" and that *Ocegueda* "was still mad" and "was not thinking clearly" at the time.[5]

Ocegueda contends the prosecutor exacerbated the instruction's alleged lack of clarity by referencing a reasonable person standard in arguing that the murder was deliberate and premeditated.  But as discussed above, the instructions were correct and unambiguous regarding the elements of first degree murder.  Any erroneous argument that an objective standard determined whether a murder was deliberate and premeditated would have been contrary to the instructions.  And Ocegueda disclaims any claim of

---

[5]    Given counsel's argument that Ocegueda was not guilty of first degree murder because there was no evidence of deliberation and premeditation, we reject Ocegueda's additional claim that counsel rendered ineffective assistance by failing to argue for second degree murder.

prosecutorial error, recognizing he did not object to the prosecutor's argument below. (*People v. Morales* (2001) 25 Cal.4th 34, 43-44 ["When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection"].)

Moreover, the prosecutor's argument focused on Ocegueda's own actions and state of mind, noting that "[a]t each step [Ocegueda] made additional choices and continued with his decision to kill." While the prosecutor referenced the "average reasonable person" in asserting there were other courses of action to consider during Ocegueda's prolonged hunt after Bahena, he did so in arguing that "upon reflection," and "at each turn," Ocegueda "went ahead and continued towards killing [Bahena]." In context, the prosecutor's argument invoked a subjective standard and was not misleading. It was only in discussing the heat-of-passion theory of voluntary manslaughter that the prosecutor asked the jury not to consider subjective factors. This was not error. (See *Lasko*, *supra*, 23 Cal.4th at p. 108.)

Having adequately instructed the jury on the law, the court was not required to add any clarifying instructions absent a request by Ocegueda. (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1331.) Ocegueda made no such request. And contrary to Ocegueda's claim, his counsel did not render ineffective assistance by failing to request an additional instruction on provocation .

To establish ineffective assistance of counsel, a "[d]efendant must show that counsel's performance was both deficient and prejudicial . . . ." (*People v. Castillo*, *supra*, 16 Cal.4th at pp. 1014-1015.) "[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance." (*Id.* at p. 1015.) Here, counsel could reasonably have concluded the instructions given adequately advised the jury, as we have, and that no further instruction was necessary. (*Id.* at p. 1018 [counsel could

reasonably conclude pinpoint instruction relating evidence of intoxication to premeditation was unnecessary because instructions adequately advised jury and counsel relied on them to argue that defendant did not act with premeditation because he was intoxicated].) As noted, counsel relied on the instructions in arguing that Ocegueda was not guilty of first degree murder due to his subjective mental state.

II. *The Sufficiency of the Evidence of Premeditation and Deliberation*

A. *Applicable Principles*

In assessing the sufficiency of evidence of premeditation and deliberation, courts often consider three factors discussed in *People v. Anderson* (1968) 70 Cal.2d 15, 26-27: planning, motive, and manner of killing. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 10 & fn. 16.) "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Pride* (1992) 3 Cal.4th 195, 247.) "In reviewing a sufficiency of evidence challenge, we view the evidence in the light most favorable to the verdict and determine whether *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

B. *Analysis*

Ample evidence supported the jury's finding of premeditation and deliberation. Initially, the record included evidence supporting all three *Anderson* factors. There was strong evidence of planning: After the first fight, Ocegueda returned to his car, armed himself with two knives, and pursued Bahena to the area of the Cozy Corner parking lot. There, he was dropped off across the street and ran across multiple

13

traffic lanes to intercept and attack Bahena. When Bahena managed to escape, Ocegueda chased him into the apartment complex, obtained reinforcement, and proceeded to commit the murder. That Ocegueda took multiple steps in the process to kill Bahena, using each break in action to increase his lethality, supports an inference of planning.[6] (*People v. Perez* (1992) 2 Cal.4th 1117, 1129 [after first knife broke, defendant searched for and obtained second knife, which gave him time to reflect and indicated planning]; *People v. Thomas* (1992) 2 Cal.4th 489, 517 [evidence suggestive of planning where defendant returned to his car to get rifle before committing murders and had to manually reload rifle between shots].)

Turning to motive, the evidence suggested Ocegueda had decided to kill Bahena because the latter allowed Morales to hit him with the skateboard when they were supposed to fight one-on-one, in addition to his exchange of words with Bahena before the fight. Ocegueda argues that for purposes of the *Anderson* factors, motive entails a prior relationship, and he contends that "[a]nger that arises on the spot because of confrontation . . . is not a premeditated motive to kill." Proof of motive, however, does not require a prior relationship. (*People v. Hovey* (1988) 44 Cal.3d 543, 557.) Nor must the motive be longstanding. (*People v. Watkins* (2012) 55 Cal.4th 999, 1026 ["simple revenge because [robbery victim] did not relinquish money" was motive supporting deliberation and premeditation].)

---

[6] The parties disagree on whether the evidence showed it was Ocegueda who fatally stabbed Bahena, but we need not decide the matter. The jury found Ocegueda guilty of murder as either the perpetrator or a direct aider and abettor. "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*People v. Chiu* (2014) 59 Cal.4th 155, 167.) The *Anderson* factors apply equally to the perpetrator and a direct aider and abettor. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295-296 [assessing sufficiency of evidence to support premeditation and deliberation as to both perpetrator and aider and abettor under *Anderson* factors].)

As for the manner of killing, Ocegueda pursued Bahena for many minutes and had ample opportunity for reflection. Yet, as noted above, he used each break in action to prepare for and intensify the next round of violence. From Ocegueda's prolonged hunt after Bahena, a reasonable jury could infer that he acted deliberately and with premeditation.[7] (See *People v. Potts* (2019) 6 Cal.5th 1012, 1029 ["A theory that a person killed in a fit of rage is undermined by proof that, after ample opportunity for reflection, the person decided that continuing a violent attack was appropriate"]; *People v. Streeter* (2012) 54 Cal.4th 205, 244 [manner of killing suggested premeditation and deliberation where "defendant's acts occurred in stages"].)

Moreover, the *Anderson* factors aside, there was direct evidence in the record suggesting Ocegueda acted in a cold and calculated manner in hunting Bahena. The video of the attack at Cozy Corner showed that after Ocegueda attempted to slash Bahena and Bahena started running away, Ocegueda calmly walked after him—holding a knife in each hand—and ultimately began a light jog in his direction. Ocegueda's cool demeanor in pursuing Bahena before the final, fatal attack further supported the jury's finding of premeditation and deliberation. (*People v. Marks* (2003) 31 Cal.4th 197, 232 ["'calm,' 'cool,' and 'focused'" manner of shooting supported finding of premeditation and deliberation].)

In support of his contention that the evidence was insufficient to prove first degree murder, Ocegueda cites *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1274.

---

[7] Ocegueda asserts there was no evidence he tried to attack Bahena with a knife during the confrontation at Cozy Corner, pointing to Morales's testimony that he thought Ocegueda had punched Bahena there. Thus, he contends his intent to kill was formed no earlier than "a few minutes before the fatal stab wound." However, the video of Ocegueda's attack at Cozy Corner shows him holding a knife in each hand and attempting to slash Bahena. Morales admitted he could not see if Ocegueda had anything in his hands at the time because Ocegueda "came out of nowhere." The jury could therefore infer that Ocegueda had formed the intent to kill following the initial fight, when he retrieved the knives from the SUV.

15

That case is distinguishable. In *Boatman*, the defendant shot his girlfriend in the face while they were alone in his bedroom. The defendant initially claimed the victim shot herself, then claimed he had accidentally shot her. (*Id.* at pp. 1258-1259.) There was no evidence of planning: nothing suggested the defendant had left the bedroom to get the gun, and following the shooting, he tried to resuscitate the victim, directed his brother to call the police, cried, and made suicidal remarks, behaving like "someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan." (*Id.* at p. 1267.) As for motive, the only evidence was a text message from the victim to a friend, saying she was having a fight with the defendant, which the court stated was, "at most, weak evidence of a motive suggesting premeditation and deliberation." (*Id.* at p. 1268.) Finally, the manner of killing did not suggest an execution-style murder, which the court said was necessary, absent evidence of planning or motive. (*Id.* at pp. 1269-1270.)

The evidence discussed above renders *Boatman* inapposite. Unlike the defendant in *Boatman*, Ocegueda engaged in a multi-step process in which he armed himself and obtained reinforcement before the murder. Unlike the defendant in *Boatman*, Ocegueda had a clear motive to kill Bahena, who had provoked the initial fight and allowed Morales to intervene and hit Ocegueda in the head with a skateboard. And unlike the defendant in *Boatman*, Ocegueda calmly pursued Bahena with two knives for about a quarter of a mile, giving him ample opportunity to reflect. In short, the evidence supported the jury's finding of premeditation and deliberation.

16

DISPOSITION

The judgment is affirmed.


                                                    O'LEARY, P. J.

WE CONCUR:


GOETHALS, J.


SANCHEZ, J.